McELROY v. MASTERSON.

(Circuit Court of Appeals, Eighth Circuit. June 27, 1907.)

No. 2,532.

1. CANCELLATION OF INSTRUMENTS—GROUNDS—IMPROVIDENCE OR UNCONSCIONABLENESS.

An unmarried man 77 years old, and in feeble health, deeded his farm to his nephew on the expressed consideration of $1 and other considerations, the deed reserving to the grantor a life estate. It was also orally agreed that the grantee should furnish support to the grantor at the grantee's own home, which he did so long as the grantor remained with him, and also paid the interest on a mortgage on the farm. Subsequently the grantor returned to the farm and commenced suit for cancellation of the deed. He was shown to have been mentally competent, and there was no evidence to establish coercion or undue influence. *Held*, that. the fact that the deed did not impose a positive obligation on the grantee for the grantor's care and support did not authorize the court to set it aside as improvident and unconscionable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Cancellation of Instruments, § 3.]

2. EQUITY—POWERS OF CHANCELLOR—CONTRACT RIGHTS.

There is no comprehensive discretion reposed in the chancellor by modern equity jurisprudence to make and unmake contracts of parties sui juris subject to such limitations only as meet the approval of his conscience, but courts of equity are now required as much as courts of law to enforce contracts free from fraud, and to refrain from making contracts for the parties on which their minds never met.

3. SAME—MODERN JURISPRUDENCE.

In the process of development, equity jurisprudence has assumed the qualities of a composite system of settled rules and principles by which the property rights of parties are measured and limited, and are rendered more certain and stable.

Appeal from the Circuit Court of the United States for the District of Minnesota.

William D. Mitchell and Pierce Butler (Jared How, on the brief), for appellant.

A. A. Stone and Thomas Hessian, for appellee.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is a suit in equity to set aside and annul a deed executed by the appellee to the appellant February

3, 1903. The land conveyed consists of about 194 acres, valued at between $9,000 and $10,000. The grounds of attack on the deed are that it was given without consideration and obtained through undue influence and misrepresentation. At the time of the conveyance the appellee was about 77 years of age, and the appellant was about 58. The appellee is the uncle and godfather of the appellant. They were born in Ireland, immigrating to America in 1850. In the party was the sister of the appellee, and mother of appellant, and her husband and perhaps some children. The appellant's parents established a home in the city of New York, and the appellee was a guest in their home for about a year. After that he drifted for a number of years, working as a common laborer, attempting once to establish a homestead in Illinois, until finally, in 1865, he pre-empted the land involved in this suit, in Nicollet county, Minn. Neither he nor this nephew ever married. The latter continued to live in the city of New York, engaged in the trade of a hatter, and succeeded in earning an independent, respectable competence.

While there were other near relatives—a brother and some nieces —the appellee had no communication with them. The father and mother of the appellant died several years prior to 1903. While the said nieces lived in the city of New York, all the information the appellee seems to have had about them came from occasional correspondence with this nephew, the appellant. So much of the correspondence between them as was preserved, ranging from perhaps 1885 to January, 1903, shows that an unusual relation of affectionate attachment existed between this uncle and nephew. In his isolation, in the far away Northwest, the uncle's heart went out with an unceasing tenderness towards this nephew. He seemed to have regarded him as indeed his godchild. He was an illiterate man, and his letters bear evidence that to him writing was indeed a severe labor, and he seems to have assumed the burden of writing only when prompted thereto by the yearning desire to keep in touch with this nephew. Though expressed in crude form, his letters were invariably characterized by a sentimental feeling of unaffected regard for the appellant. He nearly always addressed him as "Dear Patrick," and closed his letters with the words "I remain your loving uncle to death." The solicitation for this correspondence, as a general rule, came from the uncle. He often chided the appellant when he neglected writing to him for a considerable length of time, and expressed himself as being delighted whenever he did receive a letter from him. This fact is of especial moment as indicating the entire absence of any selfish or sinister motive on the part of the appellant in maintaining a correspondence with his uncle. While his letters breathed the most kindly and considerate spirit and a tender solicitude for his uncle's welfare, there does not appear in one line of any of them a word or thought that should suggest to a reasonable, candid person a lurking purpose in the mind of the appellant to obtain aught from his uncle save a continuance of their affectionate relation. Any contrary suggestion is a perversion of the language of a simple-hearted, sincere man. Several years prior to 1903, the appellant visited his uncle, evidently on invitation, and certainly to the deep pleasure of the latter. In his

testimony the appellee himself does not attach to this visit any other motive than that of sincerity and kindness. There was not an incident connected with this visit to justify any imputation of an ulterior design to subserve any selfish purpose on the part of the appellant.

The evidence shows that the appellee was not a successful farmer. Early after the acquisition of this land he placed upon it a mortgage for $1,400. This incumbrance accumulated until, at the time of the execution of the deed in question, the debt amounted to about $2,900. The increase in the value of the farm was despite the appellee's improvidence, and his retention of it intact was attributable to the indulgence of the mortgagee, who was content to let the mortgage run so long as the interest was paid, as the increasing value of the security resulting from the development of the country was deemed ample protection. As appears from the correspondence between these parties, the maintenance of the farm was becoming somewhat of a burden to the appellee, and it is to be gathered from the correspondence that the appellant had suggested to him the advisability of selling it; but he seemed to be adverse to parting with it, and it is quite inferable from the evidence that the underlying purpose of the appellee all the while was to retain this land to the end, and that he designed after his death it should go to the appellant. In 1902, by reason of physical infirmity and business incapacity, the burden of this farm and the loneliness of his situation became such as to induce the appellee to remove from it to a nearby town, and board with some friends. He was sick, and evidently became apprehensive that he was approaching the end of life. Naturally enough in such situation his mind turned to the appellant; and on December 24, 1902, he wrote to him, saying:

"It is so long since i heard from you i thought i would try to write you a few lines to yet you know how i feel i am very feeble this winter i have left my house i was not able to care for myself i have went to stay with a neighbor that has my place rented so there is no person in my house Patrick i wish to here from you if you are alive but i would like much better to see you you told me when you were [here] if anything happened that you would come here to me and i think it very near the time i think i will not be long here i think you had better come on if you are alive so we can talk to each othere do not delay as i cannot tell how i am going to last i have no more to say as i do not feel able to write any more i remain your loving uncle to Death."

It is inferable that the appellant answered this letter expressing the wish that his uncle should go to New York and live with him, as he could better take care of him. On the 9th of January, 1903, the appellee wrote the appellant as follows:

"i wish to inform you that i received your very kind and welcom letter it gave me great comfort to hear that you are still living i thought you were dead it was so long since i heard from you you said in your letter you wished me to go there my business in such shape that it is pretty hard for me to go away and leave everything behind me and has no body to look after it it is a very cold winter and i am not able to go out and see anyone about the matter if i live to spring i hope to be able to find someone that will rent it for a number of years as i would wish to go there and be buried with my people i am staying in lesueur this winter i locked the house i did not want to be found dead there if i find that i get any worse i will let you know so that you will look after my place so that there will be nobody to make any trouble i had a letter from father cauley he said he lived with roberts

daughter Bridget and that she was married to a relation of his he said she would meet me with open arms if i would go there i did not answer his letter as i did not feel good i wish you would let me know if my brothers and sisters are living or dead if i find i cannot stand it this winter i will write to you or have somebody else write to you for me so that you can come on me fix matters i do not intend to give what little there will be to anyone else i think i have no more to say at present i remain your loving uncle to Death."

On receipt of this letter it is but just to say that, prompted by a humane and commendable spirit, the appellant left his business, and on or about the 19th day of January, 1903, arrived at his uncle's boarding house to look after him and take him home with him. Their meeting was mutually most cordial. While somewhat feeble, the appellee was sitting up and was able to move about. It was concluded that he should return to New York City with the appellant and make his home with him. Assisted by the appellant he busied himself in closing up his business affairs, disposing of a little grain and some personal property on the farm, and settling up some debts owing by him.

The only witnesses to what led up to the incident of the execution of the deed are the parties to this suit. There is no essential conflict between them as to the fact that it was the long entertained purpose of the appellee that on his death the land should go to this nephew. He had every reason to so remember and reward him. The appellant had remembered and administered to him in the past when he hungered for sympathy and needed care. He had sent him raiment that protected him in winter. He had sent him clothing that made him presentable in public; and he had come to him in the hour of his extremity to render him needful assistance and cheer. The subject of who should be the beneficiary of the landed estate after the old man's death was broached by him. The only material matter about which they differ in the testimony as to what occurred between them just prior to the execution of the deed is the contention, now advanced on behalf of the appellee, that his plan was to give the land by will to the appellant, that the appellant objected to this as it might be attacked by dissatisfied relatives, and that it was better at once to convey by deed. The testimony of the appellee in chief was that he consented to the substitution of the plan of making the deed on the assurance of the appellant that whenever requested thereto he would reassign the property to the grantor. This is denied by the appellant. On cross-examination the appellee twice stated and admitted that the matter of the reassignment of the land on his request was not broached until some time after they were in the city of New York. He also testified that he made the same statement to Mr. Smullen, who drew the deed in question, that he had made to the appellant. Smullen's testimony was that he drew the deed precisely as directed by the appellee, reserving to him therein a life estate in the land, and that after it was written he read it over to him, that he fully understood it, and he thereupon signed and acknowledged it as his final act and deed. Everything was harmonious when the appellee accompanied the appellant to the city of New York. The former admits in his testimony that in respect of his treatment and comfort the appellant fulfilled his expectations. He was given a comfortable room, wholesome food, $2 per week for spending money, all the whisky he wanted, and was kindly treated. He was left free in the

use and perception of whatever rents accrued from the land. The accrued interest on the mortgage the appellant cared for.

Two causes supervened, in our opinion, to create discontent and this lawsuit: (1) The nieces met the uncle and displayed an inquisitive interest in his landed estate. He had to tell them of the conveyance to this favored nephew. (2) He began to tire of city life and to long for the purer air of Minnesota and the associations of the old home. The appellant thought this was not the best course for the old man, then 78 years of age. But he (the latter) demanded a reconveyance, or reassignment of the land, as he termed it. A wordy altercation ensued. The appellee asked for money to return to Minnesota, and the appellant, who had furnished the money to take him to New York, refused to send him back. Thereat one of said nieces, who had never hitherto given him water or bread, provided him money with which he returned, in August, 1903, to the town from whence he came to New York. He could not have felt seriously angered at anything his nephew said to him in New York, for soon after his return he wrote him a kindly letter, a part of it relative to the condition of the land. He found the income from the land wholly inadequate to his support, and he became almost an object of charity. Some of his neighbors, more lavish with advice than with any serviceable bestowments, made suggestions to him. As soon as he collected the little money arising from the year's rental of the land he invested it in legal advice, the result of which was this lawsuit, the success of which would doubtless further result, after paying the lawyers, in bestowing the remaining interest in the land upon other relatives, leaving the appellant, the hitherto cherished and deserving relative, entirely out of consideration.

There was no tangible evidence of the want of sufficient mental capacity to enable the appellee to fully comprehend and understand the force and legal effect of the deed he was executing. His testimony quite demonstrates that in mentality and quickness of perception, even at the time of the hearing, he was rather the superior of the appellant. He exhibited instances of marked aptitude in the fence and foil of the alert witness on cross-examination. It is the settled law, as expressed in Russell's Appeal, 75 Pa. 269, that a man is permitted "to dispose of all his property by way of bounty to others, and his gifts when made with full intention and knowledge of the act are irrevocable." And time and again the Supreme Court of the United States has declared that:

"The undue influence for which a will or deed will be annulled must be such as that the party making it has no free will, but stand in vinculis. It must amount to force or coercion, destroying free agency." Conley v. Nailor, 118 U. S. 134, 6 Sup. Ct. 1001, 30 L. Ed. 112; Ralston v. Turpin, 129 U. S. 663, 9 Sup. Ct. 420, 32 L. Ed. 747; Mackall v. Mackall, 135 U. S. 167, 10 Sup. Ct. 705, 34 L. Ed. 84; Towson v. Moore, 173 U. S. 17, 19 Sup. Ct. 332, 43 L. Ed. 597; Kennedy v. Bates, 142 Fed. 52, 56, 57, 73 C. C. A. 237.

The law sets its face sternly against that insidious insistence of disappointed relatives that a preferential donation or bequest of property should be regarded with suspicion when induced by considerate attentions and tender manifestations of the beneficiary toward the benefactor. Any other spirit of the law would transform exhibitions of

affection into sinister hypocrisy, and needful attentions and helpfulness by a near relative to the aged into a badge of fraud. Mr. Justice Brewer, in Mackall v. Mackall, supra, said:

"It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them. * * * It would have been strange if such a result had not followed; but such partiality towards the one, and influence resulting therefrom, are not only natural, but just and reasonable, and come far short of presenting the undue influence which the law denounces. Right or wrong, it is to be expected that a parent will favor the child who stands by him, and give to him, rather than the others, his property. To defeat a conveyance under those circumstances, something more than the natural influence springing from such relationship must be shown. Imposition, fraud, importunity, duress, or something of that nature, must appear; otherwise that disposition of property which accords with the natural inclinations of the human heart must be sustained."

The learned trial judge in his opinion found that there was no undue influence exerted or fraudulent representations made, within the recognized rules of law, by the grantee to persuade the grantor to the execution of this deed. But he placed his action in decreeing the annulment of the deed principally upon the ground that the making of the deed, although the grantor reserved to himself a life estate in the property, was improvident, because it failed to incorporate into it a positive obligation on the part of the grantee to care and provide for the grantor during his life; and for that reason he concluded that the transaction was unconscionable and ought not to be sustained.

The consideration expressed in the deed is as follows:

"For and in consideration of the sum of other considerations and one dollar."

Without deciding whether or not the express understanding between the parties that in consideration of the making of the deed the grantee was to share his home with the grantor and take care of him during his life was enforceable, as the proof of such consideration would in no wise contradict or be inconsistent with the written instrument, the evidence shows that in every particular the grantee kept his promise, and there is every reason to believe that he would have done so to the end had the uncle been content to remain at his home. The obligation rested upon the owner of the estate in remainder to take care of the mortgage on the land and the taxes thereon, to prevent the destruction of his estate. The interest thereon was being paid by the appellant. So that as the matter stood the appellee had the use and profits of the land during his life, and a home provided for him without charge. And to meet the criticism of the absence in the deed of an express obligation to so care for him, at the hearing before the circuit court, the appellant offered to enter into obligation, to be expressed in the decree of the court, to pay to the appellee in money $300 per annum, or $25 per month, during his natural life. This the trial judge thought ought to be satisfactory to the appellee, and suggested to his counsel its acceptance. This provision could have been made effective by a consent decree of the parties. But it was declined by the appellee's counsel, and the judge felt that he could not so decree against the assent of the complainant.

The bill of complaint should be dismissed, unless it can be maintained that there is a comprehensive discretion reposed by modern equity jurisprudence in the chancellor to make and unmake contracts of parties sui juris, constrained only by no other limitations than those which meet the approval of his conscience. Courts of equity are now as much required as courts of law to enforce contracts free from vitiating elements of fraud, and to refrain from making contracts for the parties on which their minds never met.

In the formative period of equity jurisprudence the English Chancellors, in the absence of established principles and recognized sensible precedents, were much given to the pursuit of their own sense of absolute right and the dictates of their own individual conscience. But in the process of development equity jurisprudence has assumed more the qualities of a composite system of settled rules and principles, by which the property rights of parties are measured and limited, and are rendered more certain and stable. Pomeroy's Eq. Jur. § 48, etc.; Roberson v. Rochester Folding Box Company, 171 N. Y. 538, 64 N. E. 442, 59 L. R. A. 478, 89 Am. St. Rep. 828.

The decree of the Circuit Court must be reversed, and the cause remanded, with directions to dismiss the bill of complaint.