EZRA S. LEFURGY, as Administrator, etc., Respondent, *v.* MARIE B. LEFURGY, Individually and as Executrix, etc., of LEONARD T. LEFURGY, Deceased, Appellant, Impleaded with Others, Defendants.

Second Department, April 5, 1918.

**Decedent's estate — action to compel return to estate of savings bank accounts transferred by deceased to her cousin — fraud and undue influence — evidence — burden of proof.**

In an action against the widow and executrix of a cousin of the deceased, to compel the return to her estate of savings bank accounts originally standing in her name, it appeared that two years prior to her death she changed the deposits in two banks from her own name to her name in trust for her cousin, and at the same time transferred another account to a joint account in favor of herself or her cousin. Her cousin, the defendant's testator, died one week after the deceased, who it is claimed was of weak intellect and was unduly influenced to transfer the accounts by the defendant's testator.

*Held,* that if the defendant's testator were now living, the burden would rest upon him of showing that the transfers were freely made, and that the transactions so far as his conduct was concerned were fair and honest, and the same burden now rests on defendant, his widow and executrix;

That the evidence conclusively establishes that there was no fraud or undue influence on the part of the defendant's testator, and that the complaint should be dismissed on the merits.

APPEAL by the defendant, Maria B. Lefurgy, individually and as executrix, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Westchester on the 4th day of March, 1915, upon the decision of the court after a trial at the Westchester Special Term.

The judgment decreed that certain savings bank accounts standing in the name of the appellant executrix be transferred and paid to the plaintiff administrator.

The amounts of the deposits involved are: Home Savings Bank, White Plains, $1,488.76; Peoples Savings Bank, Yonkers, $2,304.31; Westchester County Savings Bank, Tarrytown, $1,511.20; total, $5,304.27.

The action was brought against the widow and executrix of Leonard T. Lefurgy, a cousin of the deceased Elizabeth Lefurgy, to compel the return to the estate of Elizabeth of the three savings bank accounts, originally standing in the name of the deceased. In October, 1912, Elizabeth went to the banks in Yonkers and Tarrytown and changed the deposits from her own name to " Elizabeth Lefurgy in trust for Leonard T. Lefurgy," and at the same time transferred the account in the White Plains bank to a joint account " Elizabeth Lefurgy or Leonard T. Lefurgy." Elizabeth died on February 18, 1914. Her cousin Leonard, defendant's testator, to whom the accounts were transferred, died on February 25, 1914, one week after Elizabeth. The plaintiff charges that Elizabeth was a woman of weak intellect and low order of mentality, easily imposed upon and influenced, that she lived a retired and secluded life, having little association with her neighbors. Plaintiff alleges that Leonard Lefurgy, defendant's testator, took advantage of her condition and surroundings and unduly influenced her to transfer the various bank accounts so that he might gain possession of them, and avers that she did not understand the nature or purpose of the transfer. Elizabeth was unmarried, and her only relatives are cousins — some thirty in number. The defendant's testator, Leonard Lefurgy, who is thus charged with misconduct, did not withdraw any of the money from the savings banks or interfere with the accounts during the two years intervening between the transfers and the death of Elizabeth, and he died one week after her. After his death his widow, the defendant executrix, procured the transfer of the accounts to his estate. This action was commenced in June, 1914, to compel the return of the accounts, and the trial court held that, Leonard occupying a fiduciary relation towards plaintiff's intestate, the defendant had not sus-

tained the burden of showing that the transaction was fair and honest.

*R. E. Digney,* for the appellant.

*Eben H. P. Squire,* for the respondent.

Kelly, J.:

The learned trial judge held that the decedent Elizabeth had technical testamentary capacity at the time the transfers were made, but that she was of weak mind, queer, eccentric and advanced in years, and that her cousin Leonard, defendant's testator, occupied a fiduciary relation towards her. If Leonard were now living, the burden would rest upon him of showing that the transfers were freely made and that the transactions so far as his conduct was concerned were fair and honest, and the court held that the same burden was on defendant, his widow and executrix. The legal conclusion reached by the trial judge is well established. (*Cowee v. Cornell,* 75 N. Y. 91; *Matter of Smith,* 95 id. 522; *Barnard v. Gantz,* 140 id. 249.) But we think that the defendant executrix, with this burden placed upon her and with the added burden of the death of her husband who is charged by the plaintiff with defrauding his cousin Elizabeth, has shown by a preponderance of the evidence and conclusively that there was no fraud, undue influence or overreaching on the part of Leonard, but that the transactions were natural, honest and fair in every way. The deceased Elizabeth was a woman about sixty-seven years of age at the time of her death, and she lived on a small farm in the town of Greenburgh in Westchester county, which had belonged to her grandfather and later to her brother Stephen, who died in 1910. Stephen, as well as his sister Elizabeth, was single, and the two lived there alone, doing the work about the farm with occasional outside help hired by them. The farm had not been well kept up, and the farm house was dilapidated. Elizabeth worked about the farm in her brother's lifetime and after his death. She did men's work, wore coarse clothes, heavy boots, and it is claimed that she was not a very good housekeeper. When Stephen died in 1910, he left a will by which the farm was devised to a cousin, Daniel Lefurgy, who lived in Mich-

igan, and Elizabeth objected to the probate of the will, the result of which would have turned her out of her house and home. She compelled Daniel to compromise with her, by granting her a life estate in the farm and making her a payment of twenty dollars a month, with the right to Daniel to sell the farm, in which case he was to pay her forty dollars a month. Daniel executed an agreement with her to that effect. She withdrew her objections and the will was admitted to probate upon her consent. In this matter of the contest of her brother's will, her cousin Leonard appears to have sided with her and aided her, and the agreement provided that the monthly payments should be made to Leonard and applied by him to her support, instead of being paid directly to Elizabeth. This is the basis for the charge that Leonard occupied the relation of trustee towards his cousin, and the evidence shows that from the date of the agreement in 1910 down to her death in 1914 Leonard made these payments, and that he visited her at the old farm house where she was living with a woman who helped her about the house, and a man who slept in the house at night. So far as the evidence goes, Leonard was the only one of the thirty cousins who visited her or took any interest in her. Undoubtedly their relations were friendly and affectionate; she told the servant that she wanted her money " to go to Len because he was very kind to her." He visited her usually on Sundays; he took lunch at her house at times, but all through the case he is, apparently, the only one of her blood who took the trouble to go to see her. There is no suggestion that Leonard ever took a penny from her in her lifetime. One of the accounts was transferred to his name jointly with her own, but there is no claim that Leonard interfered with it in any way. Now, there is nothing unnatural or unreasonable in gratitude. If she had made a will leaving him whatever she had, it would have been a very natural thing. The relations of the parties were such that very slight evidence was required to do away with any presumption of wrongdoing on the part of Leonard. (*Donlon* v. *Donlon,* 154 App. Div. 212; *Ferris* v. *Ferris,* 22 Misc. Rep. 577; affd., 34 App. Div. 144.) What was more natural than a desire on her part to give her small estate to the one relative who evinced some practical interest in her

welfare, rather than dissipate it among thirty cousins who never troubled themselves about her? And this is what Elizabeth did when she changed the form of her savings bank accounts two years before her death. But it is said she was old, she was eccentric, her manners were uncouth, her dress was peculiar, she wore men's boots and a man's hat, and her house was dirty, or, as the learned counsel for the plaintiff elicited from a neighbor, " not a house such as anybody with refined feelings would like to live in." But the only evidence in the case of lack of mental capacity is the testimony of a physician called to attend her brother some years before her death, apparently against her wishes or at least not with her approval, whose testimony is very remarkable in astonishing conclusions without any facts or details to justify them, although pressed by court and counsel to tell upon what he based his conclusions. This gentleman said at one place, " I consider her an imbecile," followed by the question, " Was she insane? A. No, I could not think that she was insane in the sense of being insane, she was not suffering from what we call dementia." The learned trial judge intervened to ask the doctor: " By the Court: Q. Imbecile is the strongest term of mental incapacity you can use, don't you know that? A. I know that; but in my judgment she was not insane; but she was not normal in her mind. * * * Q. Don't you know that imbecile means the extremest mental deficiency? A. I know that. But I mean in the sense of the word as far as the mind itself is concerned." It will be observed that, to say the least, this is confusing. And pressed upon cross-examination continually to detail some facts to justify his conclusion, he failed or was unable to get down to anything tangible, so that the court finally said to him: " By the Court: Q. He wants to get out just what was in the actions which you thought irrational? (No answer.)" He finally said her walk was peculiar, her gait was eccentric, her clothes and her hair were " disorderly." We do not think that a finding of mental incapacity should be based on this kind of testimony from a physician whose opportunities of observing this woman now deceased were, to say the least, very limited. His testimony is the only evidence in the case which attacks her mentality, and he was contradicted by the associate of the

regular family physician who treated both the brother and sister at various times during nine years before her death, who knew her quite well. This last physician was called as a witness by the plaintiff. He said: " She was a little eccentric in her dress. * * * She wore heavy rubber boots, men's boots, and she conducted the farm work; she managed the farm to a very large extent while her brother was sick." Her house was not very clean, it was disorderly. " She and her brother lived there alone and they had very little intercourse with the world; they were recluses and they had gotten a little out of the ordinary way of living; did not keep up appearances that most farmers do." They were " old French stock. * * * I think she was born on the farm and always lived there." But this witness for plaintiff said that she kept her hands and face clean, he gave her directions for the care of her brother and she followed them. He knew her very well. She was very generous, she had a great sense of humor, and when asked his opinion as to whether " she was normal or abnormal," answered, " I think she was a poor, ignorant woman. I do not think she ever had a great deal of education; they lived alone, she and her brother, and they would be like any two people would be that lived alone. * * * She was certainly not a strong-minded woman." This physician would not testify that she was even irrational, let alone mentally incapacitated. As against this evidence, which to say the least was not very satisfactory, the defendant, to meet the burden placed upon her by the law, and deprived of the assistance of her deceased husband charged with defrauding his cousin, produced such an array of disinterested witnesses to the mental soundness and capacity of the deceased Elizabeth as in our opinion more than sustained the burden, and which showed conclusively that she was fully capable of understanding what she did and that the change in the bank accounts was her own natural, intelligent act, uninfluenced by any unlawful advice or persuasion by defendant's testator. Neighbors, men and women, who knew her from childhood, who met her every day, who visited her and conversed with her; the lawyer who represented her on the contest of her brother's will; the minister of her church, who visited her and conversed with her, who said " she was absolutely cleanly,"

that her house was " just such as you would find a person working," and whose opinion as to her dress is " She dressed as a woman who was working would. She did not dress eccentrically at all, no more than any other woman." Defendant called the man who roomed at the house after the death of her brother, who knew her for thirty years, who saw her at home, on the street, at sociables and at moving picture shows. The plaintiff called as a witness the woman who helped about the house, who talked with her about the house and the farm, and who testified that Elizabeth told her about the change made in the bank accounts when she returned home. In our opinion, the evidence on the part of defendant more than counterbalanced that of the plaintiff and contradicted any presumption of unfairness or undue advantage in Leonard's dealing with the deceased. Cleanliness is, of course, of the highest importance, and a tidy, well-kept house is desirable. But it is a dangerous thing to decide that dirt and untidiness are evidence of insanity. This woman of sixty-seven, living all her life on a farm, doing men's work in rough clothes and heavy boots, attending to the cattle and working about the farm, may not present as attractive a picture as some women differently situated. If eccentricity in woman's dress is to be a standard on which to measure their mentality, a wide field is opened. Elizabeth's walk or gait cumbered with heavy farm boots may have been lacking in grace, her education may have been limited and her house " not a house such as anybody with refined feelings would like to live in," but none of these things are worth serious consideration as a basis for finding mental unsoundness in the case of this dead woman, or fraud and undue influence on the part of her deceased cousin. Her home was not attractive to the thirty cousins represented by the plaintiff administrator, because, with the exception of Leonard, none of them took any interest in her. But in reality this litigation was not instigated by the thirty cousins. These bank deposits, aggregating about $5,000, would not go far among these thirty cousins when the expense of administration and legal charges are deducted. The real motive in the case, and motive is always of importance in a court of equity and good conscience, is found in the testimony of the cousin Daniel from

Michigan, who was the devisee of the farm under Stephen's will in 1910, and who had been forced to compromise to avoid a contest by Elizabeth, with Leonard's assistance. Mr. Daniel Lefurgy was asked: "Q. You are really the man who started this litigation, aren't you? A. Yes." And the learned counsel who represents the plaintiff in this case is Daniel's lawyer who represented him in 1910 in the will contest. Daniel's share in the net bank deposits — one-thirtieth — would hardly pay his railroad fare and expenses from Michigan to Westchester county and back again. The case is open to suspicion that it is in retaliation for Leonard's assistance to the deceased Elizabeth long ago. We think the defendant, appellant, was entitled to judgment on the merits.

The judgment is reversed, with costs, and the complaint dismissed upon the merits, with costs. The 3d, 6th and 12th findings of fact and all of the conclusions of law are reversed and the court finds as matters of fact the matters set forth in the 8th, 9th, 10th, 11th and 12th proposed findings of fact, and all of the conclusions of law proposed by the defendant, appellant, and further that the transfers and changes made in the savings bank accounts were made by Elizabeth Lefurgy, deceased, of her own free will and without any undue influence, duress or fraud on the part of Leonard T. Lefurgy, deceased, or any other person, and that said Elizabeth was of sound mind and understood the nature of her transactions.

JENKS, P. J., THOMAS, PUTNAM and BLACKMAR, JJ., concurred.

Judgment reversed, with costs, and complaint dismissed upon the merits, with costs. Order to be settled on notice before Mr. Justice KELLY.