JOHN E. MACLEAN, as Executor, etc., of MARGARET CHURCHILL, Deceased, Plaintiff, *v.* ALDEN HART, Defendant.

Supreme Court, Albany County, July 27, 1931.

*John T. Norton,* for the plaintiff.

*Theodore R. Haviland,* for the defendant.

LOUGHRAN, J. Margaret Churchill died on March 17, 1928 in her ninety-third year. Plaintiff is the executor named in her last will and testament, made September 25, 1920 and probated April 28, 1928. On November 22, 1924, defendant entered into a written agreement with Margaret Churchill. The primary object of this action is a judgment declaring that agreement void, and directing defendant to account for moneys received by him under it The question is whether the agreement was procured in circumstances such as to have precluded the exercise by Margaret Churchill of free and deliberate judgment.

On November 22, 1924, Margaret Churchill was a childless widow in her eighty-ninth year. She was entirely blind. Her nearest relatives were nieces (one of whom is plaintiff's wife), and the wife of defendant, a first cousin one degree removed. She lived with a housekeeper and companion in premises rented for thirty dollars a month. Her monthly household expenses averaged sixty-five dollars. Her assets, consisting in larger part of mortgages upon real property, aggregated a quarter of a million dollars.

Defendant is an active, experienced business man. At the date of the agreement he was fifty-six years of age. It is admitted that for years theretofore he " had been on terms of great intimacy and confidence " with Margaret Churchill. Previously he had managed some of her affairs under a power of attorney recorded December 31, 1920. He knew the character and extent of her property.

By the agreement Margaret Churchill assigned to defendant " all interest, dividends, profits and income of every name and nature now due or hereafter maturing or payable to her, to and including the date of her death." Defendant upon his part thereby undertook " entire personal charge " of all the property of Margaret Churchill and " from the income so received by him to supply and pay for [her] necessary and proper support, care and maintenance throughout her lifetime and in the same comfortable manner heretofore enjoyed by her; and to pay all bills hereafter contracted for [her] benefit for rent, household provisions and supplies, clothing, care, companionship, nursing and medical attendance; and upon [her] death to account for and pay over to her executors the remaining securities, investments and property comprising the principal of her estate as of the date hereof with income therefrom computed only from and after the date of her death."

The draftsman of the agreement is a member of the bar of experience and standing. He had never represented defendant personally prior to the transaction in issue. He had known Margaret Churchill in his youth, but had not seen her for years before the day the agreement was executed. The agreement was prepared at defendant's behest upon data supplied by him. Defendant and the draftsman went together to the home of Margaret Churchill the day it was signed. The draftsman tells us that Margaret Churchill then said to him: " I had Mr. Hart [defendant] call on you, and I wanted an agreement signed between him and I, where he could have the income of my property, provided I would be certain that it didn't impair the principal of my estate." The agreement was read by the draftsman as fulfilling the idea so expressed by Margaret Churchill. She asked, " if the way that that was read the principal could not be impaired through any loss, or anything, while she lived," and the draftsman answered, " No, it could not, that that was Mr. Hart's [defendant's] risk." Defendant took no part in this conversation. The draftsman had then no specific knowledge respecting the property or income of Margaret Churchill, and made no inquiry upon that subject. He did not suggest to her that it was proper that she have independent legal advice in the matter. He thought the agreement " was as much

for the one as for the other." The writing having been executed in duplicate, one part was kept by each of the parties. The draftsman never saw Margaret Churchill thereafter.

The agreement had been in force three years, three months and twenty-six days when Margaret Churchill died. During that period, the gross income received by defendant from her property amounted to $47,340.32. Of that sum, he expended $10,913.20 in performance of the transaction upon his part. The balance ($36,427.12) he has retained as part of compensation for his services under the agreement. In addition, he claims, upon the same basis, $3,344.66 of income accrued, but not received, before Margaret Churchill's death, and $6,250 as the increment in value, during the contract period, of certain bank stock owned by her.

The transaction cannot be sanctioned in a court of equity. The effect of the bargain was instanter to deprive an aged and infirm woman of personal control of all her property for the rest of her life. It is by no means clear what obligation was assumed by defendant in respect of the principal estate thereby committed to his charge. He contends that, " the principal, when once collected, was not by the terms of this contract permitted to be reinvested, except as he thereby assumed full responsibility for all losses in so doing." Assuming that the agreement will bear that construction, Margaret Churchill had no specific security for this personal undertaking of defendant, upon which the agreement required him to account only after her death. I do not agree that defendant properly interprets the agreement when he says that " regardless of the sufficiency of such income, he expressly covenanted and agreed to pay all bills thereafter contracted for her benefit " for the purposes specified. The bargain was that he was to pay such bills " from the income so received by him." It was to defendant's pecuniary interest to increase that income. Nothing in the agreement limited his discretion in respect of the character of reinvestments of principal. The structure of the bargain was unfair to the party for whose benefit it is alleged to have been made.

It may be that Margaret Churchill's infirmities had not produced in her a degree of imbecility which rendered her incompetent to make the agreement, all other things being equal. The record shows, however, that her mind was susceptible to influence exerted by one who had her confidence. She did not deal with defendant at arm's length. She could hardly have apprehended the formal language of the agreement. The brief explanation thereof made in defendant's presence was not adequate in the circumstances,

She was entitled to have had outside legal advice in his absence. The disproportion between the service contemplated and the compensation virtually assured to defendant emphasize the essential inequality of the arrangement.

I conclude that the agreement did not represent the free and deliberate judgment of Margaret Churchill. Had she challenged the validity of the transaction in her lifetime, it would have been condemned in equity without hesitation. Is the case any different because she was apparently content with the arrangement to the end?

On May 2, 1928, defendant turned over, as the principal of Margaret Churchill's estate, securities valued at $245,000, and plaintiff receipted therefor as executor. By her will Margaret Churchill bequeathed specific legacies totalling $62,500, including one to defendant of $5,000. Plaintiff is made her residuary legatee, " in recompense to him for the services he has rendered to me in my lifetime, and for such services as he may render as my executor." Of the principal turned over, plaintiff receives approximately $182,000. From these facts defendant argues that his agreement with Margaret Churchill has resulted in no more than an equitable distribution of her property now that she is gone. The argument cannot prevail. We are dealing with a contract, not with a testamentary disposition. There is a legal implication of undue influence from advantage gained in a fiduciary relationship by the dominant party through a transaction *inter vivos*. (*Barnard* v. *Gantz*, 140 N. Y. 249; *Allen* v. *LaVaud*, 213 id. 322.) No such rule affects a testamentary gift. (*Matter of Smith*, 95 N. Y. 516; *Loder* v. *Whelpley*, 111 id. 239, 250; *Matter of Murphy*, 48 App. Div. 211.) Nor may the court adventure itself with the contention that it would be unjust to take from defendant his profit under the agreement so as to increase the substantial sum already received by plaintiff under the will. Without assistance, Margaret Churchill dictated the will to her housekeeper and companion. She never altered that instrument. There is no proof that plaintiff had any part in its preparation or execution, or that he knew of its contents before her death. The will has been probated. In this action plaintiff is a continuation of the personality of Margaret Churchill. The question here is whether the agreement, in and of itself, is to be approved. That question is to be determined just as it would be were some third person the residuary legatee under the will.

So far as appears, Margaret Churchill expressed no dissatisfaction with the agreement during the more than three years of its operation. Defendant contends that this circumstance repels the implication

of undue influence in the transaction. The agreement was never read to Margaret Churchill after she had signed it. She never mentioned it again to the housekeeper and companion, who continued to pay the household expenses as before, and was reimbursed by defendant. Margaret Churchill did not leave her home after July, 1926. She had left it previously at Thanksgiving time the year before. On both occasions she had visited the home of defendant. She was confined to her bed during the last nineteen months of her life. Her hearing had been failing for two or three years before she died. Defendant was continuously in communication with her after the agreement with him had been made. In the circumstances, any inference from the fact that the agreement went unchallenged in Margaret Churchill's lifetime is of slight and conjectural significance.

On June 29, 1929, defendant filed with plaintiff, as executor, a claim for services rendered in the management of Margaret Churchill's property from June 19, 1919, to the date of the agreement (November 22, 1924). The amount of that claim is $53,511.17. Plaintiff, as executor, immediately rejected it. On July 15, 1929, defendant petitioned the Surrogate's Court for payment of the legacy bequeathed to him by the will and for an accounting by plaintiff, as executor. The petition also asked that, upon the final accounting, defendant's claim be determined and allowed. This action was commenced July 24, 1929. Defendant contends that these facts evidence laches defeating plaintiff's remedy. The contention is untenable. (*Eidlitz* v. *Manhattan Wrecking & Contracting Co.*, 164 App. Div. 591, and cases cited.) It may be noticed that, when the agreement in question was made, defendant omitted to mention his claim that Margaret Churchill was then indebted to him in the sum of $53,511.17 for his past services to her. The assertion of the claim is in no fair sense consistent with defendant's position at the date of the agreement that " the principal of the estate should remain intact."

Finally, defendant contends that an estoppel precludes this action. It is admitted that a copy of the agreement was transmitted to plaintiff in March, 1926. What duty was thereby imposed upon plaintiff? What change in position did defendant thereafter suffer? Margaret Churchill was then alive. Plaintiff had then no standing which entitled him to contest defendant's position under the agreement. He then owed no duty to defendant to see to it that Margaret Churchill was not further prejudiced by the transaction. Defendant continued to support Margaret Churchill out of her own property until she died two years later. After her death,

he could not change his position. The agreement then was at an end. There is no basis in the record to the alleged estoppel.

Plaintiff is entitled to judgment annulling the agreement in question, directing defendant to account for the moneys received by him thereunder, and enjoining any further proceeding by him in the prosecution of any claim based thereon. Defendant's claim against the estate of the testatrix for services is not before me. (228 App. Div. 379.)

A stipulation made upon the trial entitles defendant to recover the value of his services to Margaret Churchill between the date of the agreement and the date of her death. Annulment of the agreement will operate to defendant's detriment only to the extent of the difference between the value of these services and defendant's profit under the agreement. Defendant has reserved the right to offer proof of such value. If he is to offer that proof, he may do so at a time to be fixed upon application to the court. Upon the completion of that proof, or waiver of the right to submit it, decision and judgment will be signed.