**IRWIN v. SIMMONS et al.**

**No. 233.**

Circuit Court of Appeals, Second Circuit.

Jan. 28, 1944.

Harold H. Levin, of New York City, for plaintiff-appellant.

Lewis, Marks & Kanter, of Brooklyn, N. Y. (Lloyd B. Kanter, of Brooklyn, N. Y., of counsel), for defendants-appellees.

Before SWAN, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The decedent Emilie Simmons, had two children, plaintiff, the daughter and administratrix of her estate, and the defendant Clarence Simmons. No persons other than plaintiff and defendant have any interest in the estate. Decedent, shortly before her death transferred to Clarence all her interest in the corporate defendant, Rutland Road Realty Corporation. Plaintiff brought this suit to set aside that transfer on the ground that it had been procured by undue influence and on the basis of misinformation given by Clarence to his mother as to the value of the interest transferred. Plaintiff prayed that, if the trans-

---

fer should be set aside, Clarence should be required to account to Rutland or its receiver for alleged misfeasance as officer and director of that corporation. After a lengthy trial, the trial judge made a finding, amply supported by the evidence, that there had been no undue influence. He also made other findings which led to conclusions of law adverse to the plaintiff, and entered a judgment dismissing the complaint on the merits. From that judgment plaintiff appeals.

We shall not in detail state the facts, for they fully appear in the opinion and elaborate findings of the lower court.[1] The only question which calls for discussion is whether Clarence, because he managed the corporation, in which both he and his mother had an interest, was a fiduciary who had a duty to give her detailed periodic reports of the corporate affairs and whether, having failed to do so, it can be said that she was so misinformed as to the value of the stock which she transferred to him that he was guilty of fraud or overreaching.

There can be no doubt that he did not supply his mother with such information as should be given by an ordinary agent to his principal. The financial statement of September 29, 1927, which she approved, was none too clear. But it was prepared by an accountant for the company and apparently with the knowledge of Orr,[2] who had been the lawyer and an officer of the company from the date when it was organized by decedent's husband and before Clarence became active in the management. Orr, many years before decedent's death, had acted as her lawyer in drafting her will. Shortly before her death, at the age of eighty-three, when she planned to make a new will, she again asked Orr to draft it. Orr was thoroughly familiar with the corporation's business activities and finances. Not long before she made the assignment to Clarence, which plaintiff here attempts to assail, decedent, in writing Orr with reference to her desire to make a new will,[3] said that she wanted a statement of what she then owned. But a

few weeks later she called at Orr's office. He testified that she then asked him about, and he informed her of, the condition of the company "only in very general terms, in view of the losses of which she had a general knowledge." Over the twenty years during which she made her home with Clarence, he often discussed the business with her. A few months before her death, when she asked Clarence about the value of her interest in the corporation, he informed her that "it was pretty hard to judge, it was all in real estate and you could not tell. We had very little cash and we had some things that were not rented and other vacant land and things were pretty bad * * *". Considering the nature of the corporate assets, the trial court was justified in making the following finding: "That there were large losses to a corporation owning vacant land, unoccupied houses, and second mortgages from 1929 to the date of decedent's death must be true * * *. To have stated with substantial accuracy, the value of the assets of the corporation, at any time subsequent to 1929, and before the death of the decedent, would have been extremely difficult, as the value of real estate and second mortgages was extremely problematical during that time * * *. The decedent was generally apprised of those losses, and they were known to Mr. Orr, who was her attorney, and the secretary of the corporate defendant." The evidence supports the trial judge's finding that Orr and Clarence gave decedent such information as she desired, that she did not want the details of the financial transactions, that "she knew generally of the affairs", and that Clarence had not misled her concerning the value of the interests which she assigned to him.

Plaintiff, calling attention to the fact that Orr was one of Clarence's lawyers and that Orr testified that, with respect to major corporate matters, he always followed Clarence's directions, suggests that Orr was dominated by Clarence and incapable of serving as the decedent's disinterested legal adviser. But, as neither Orr's testimony nor anything else in the

---

[1] Plaintiff makes much of the fact that certain of the findings are not supported by the evidence; but those unsupported findings are of no importance.

[2] Clarence testified that his mother and he "went into Mr. Orr's office and met Mr. Hockfedder [the acountant] there, and we told him what we wanted to do. We asked Mr. Hockfedder to make up a

statement showing everything, how my mother and all of us stood at that time, and this statement was supposed to show just exactly how everything stood in 1927 when the statement was issued."

[3] Having destroyed her old will, she did not make a new one but instead made the assignment to Clarence which plaintiff here seeks to have set aside.

record showed any lack of integrity on Orr's part, we see no reason why he should not be regarded as the decedent's fair and impartial adviser. The fact that he was one of Clarence's lawyers and continued to be the lawyer for and an officer of Rutland when Clarence managed it is not sufficient to justify the conclusion that he did not honestly and disinterestedly represent the decedent when she asked his advice or sought information from him.

There is abundant evidence that she wished Clarence to become the owner of all her property, no matter what its worth. There is evidence that she had reached the concluson that plaintiff, her daughter, was "a very selfish woman." Although affluent, plaintiff had done little for her mother and, .as contrasted with Clarence, had not been markedly attentive to her for many years. Decedent told one of her friends that plaintiff was "well provided for," and that, for that reason, she had decided to cancel her old will in which plaintiff was a partial beneficiary and to leave everything to Clarence. The trial judge found, and his finding is supported by substantial testimony, that decedent "felt, and properly so, that all that she possessed had resulted from the act of the individual defendant in saving the property * * *" and that, having in mind his many years of devotion to her when, without expense to her, she lived happily with him, she "intended to give all that she had to the individual defendant * * *".

Late in September 1940 decedent became gravely ill. Medical examination showed that she was suffering from cancer of the colon and it was decided that an operation was necessary. At that time she transferred certificates for all the Rutland stock to her son, causing his name to be inserted in the assignment clause on the original certificates which long before she endorsed in blank. A few days later, Orr spoke to Patterson, a lawyer (who lived near the decedent and her son), asking him to prepare an instrument by which decedent would transfer to Clarence all her shares. Patterson had never theretofore been decedent's lawyer. He shared offices with Clarence, but had never been his attorney. Patterson called on decedent just before the operation which was soon followed by her death. He said to her that Orr had told him that she "was disturbed in her mind as to whether she had done enough in what she had done to protect Clarence and she wanted to sign another paper that would protect Clarence, and that he [Orr] had dictated the substance of what he thought she wanted to sign" and that Patterson had "put it in writing and wanted to know if that was so." Patterson read the paper to her and she said "Yes, that is what I want to do." She then signed and acknowledged the assignment. The trial judge found, on the basis of substantial evidence, that when she executed this assignment, decedent "was alert mentally, and in full possestion of her faculties, and was not in any way affected mentally by her physical condition."

The highly informal manner in which Clarence reported to his mother concerning her affairs is not to be commended. Yet it is a not uncommon mode of dealings between parent and child living together and in constant, intimate, affectionate relations such as we find here. Considering the circumstances, and the fact that she had Orr as her legal adviser, it would be indeed harsh to hold that Clarence's conduct must be judged as if he were an ordinary trustee.

According to plaintiff, a trustee under an express trust unrelated to his beneficiary, a lawyer dealing with his client, a guardian dealing with his ward, and a son in Clarence's position are all to be dealt with alike. They are all, says plaintiff, "fiduciaries" and whatever legal obligations are imposed on one kind of fiduciary must be imposed on every other kind. Fortunately the courts have made no such rigid rule, but have recognized that such an argument involves the familiar one-word-one-meaning (or "pigs is pigs") fallacy.[4] In Coomber v. Coomber, L.R. 1911 1 Ch. 723, 728-729, a suit to set aside a deed from a mother to her son, Fletcher-Moulton, L.J., observed: "It is said that the son was the manager of the stores and therefore was in a fiduciary relationship to his mother. This illustrates in a most striking form the danger of trusting to verbal formulae. Fiduciary relations are of many different types; they extend from the relation of

---

4 See United States v. Forness, 2 Cir., 125 F.2d 928, 932; Commissioner v. Marshall, 2 Cir., 125 F.2d 943, 946, 141 A.L.R. 445; Andrews v. Commissioner, 2 Cir., 135 F.2d 314, 317; City of New York v. Hall, 2 Cir., 139 F.2d 935, January 19, 1944; Arnold, Criminal Attempts, 40 Yale L.J. (1930) 53; cf. United Shipyards v. Hoey, 2 Cir., 131 F.2d 525, 526, 527, and especially note 5.

myself to an errand boy who is bound to bring me back my change up to the most intimate and confidential relations which can possible exist between one party and another where the one is wholly in the hands of the other because of his infinite trust in him. All these are cases of fiduciary relations, and the courts have again and again, in cases where there has been a fiduciary relation, interfered and set aside acts which, between persons in a wholly independent position, would have been perfectly valid. Thereupon in some minds there arises the idea that if there is any fiduciary relation whatever any of these types of interference is warranted by it. They conclude that every kind of fiduciary relation justifies every kind of interference. Of course that is absurd. The nature of the fiduciary relation must be such that it justifies the interference. There is no class of case in which one ought more carefully to bear in mind the facts of the case, when one reads the judgment of the court on these facts, than cases which relate to fiduciary and confidential relations and the action of the court with regard to them. In my opinion there was absolutely nothing in the fiduciary relations of the mother and the son with regard to this house which in any way affected this transaction. It is possible that there might have been a transaction between the son and the mother, with regard to a purchase of this leasehold property, in which the son would have had to shew that he had given her full information in every possible way as to the value. But in this case the gift was not based on value in any way at all. The mother knew the house, she had lived in it for twenty years and knew the son was managing it. *She meant it to go to the son whatever its value was,*[5] and that wish of hers is not shewn to be brought about in any way by any—I will not say improper conduct of the son, but any—conduct which put any responsibility upon him in the matter. For these reasons I think that no objection whatever to this transaction can be based on the fact that the son managed the business."

Gifts from or releases by a parent to a child, or a wife to her husband, or the like, stimulate two conflicting principles. On the one hand, some suspicion of undue influence arises. On the other hand, where there has been a justifiable feeling of gratitude on the part of the relative making the gift, or giving the release towards the other relative, the courts have sensibly perceived the desirability of legally sanctioning the natural inclinations attendant upon such a situation. In balancing those two attitudes, the latter is generally given the greater weight, even when the person benefited, because of agency or other facts, owes his benefactor a fiduciary obligation. Here, as often, in dealing with legal problems, the courts must work out a resolution of clashing doctrines.[6] Legal principles do not

---

[5] Italics added.

[6] It is a mistake (encountered not only in legal thinking but almost everywhere in the history of thought, going back as far at least as Aniximander and Heracleitus and found more recently in the "dialectic" of Hegel and the Marxists) that the clash is always merely between two opposites. Dean Green, referring to comments by Dickinson and Cook, that legal principles and rules "have a significant habit of traveling in pairs of opposites" and "are in the habit of running in pairs," wisely says: "Perhaps it is more accurate to say that these principles and rules travel and run in 'packs' instead of 'pairs,' and it is seldom that there are as few as a 'pair' in a 'pack.'" Green, Judge and Jury (1930) 27 note.

Demogue remarks, "We cannot agree * * * that, with respect to the elementary facts of life, the opinions and plans are always only two, that * * * every quarrel reduces itself to a yes and a no." It is not true "that the manifold of ideas which enter into strife have only two simple solutions. While the facts may sometimes have this appearance, the warring conceptions rather resemble a crowd trying to pass through a narrow passage where the struggles between various individuals are but incidents of a more general conflict. If we affirm the contrary, we are only obeying a mental trend toward simplification, even to the extent of mutilating and changing facts; we are following our inclinations rather than realities." Demogue protests against "duellistic theories * * * which see everywhere in life between two opposite theories * * *. Correct as approximations, these duels, if closely examined, are really battles between masses, certain parts of which support or oppose just as well one or the other of the two combatants." Demogue, Analysis of Fundamental Notions in Modern French Legal Philosophies (1921), 397, 563.

live in splendid isolation; the making of adjustments, compromises, between principles is an ever-present judicial duty.[7]

In Ferris v. Ferris, 22 Misc. 577, 49 N.Y.S. 593, 594, a son, with whom his mother lived for years as here, managed her property at her request. He was chargeable with about $4,800 a year, during some ten years, of which he gave her about $1,800 a year. He also occupied two residences, in which she had a life estate, without paying her anything therefor. She executed releases to him on account of any obligation or indebtedness growing out of this relationship, one of the releases prepared by his attorney, being executed when she was 82 years of age. In a suit by her administrators to set aside these releases and for an accounting, Judge Gaynor held that the son occupied a position of trust and went on to say, "Bare proof of this relation therefore made a prima facie case for the plaintiff. But more than that was proved. The special facts and circumstances of the relation of son and mother were shown, and I think they were sufficient to rebut not only the presumption created by the prima facie case established by proof of the bare relation of trustee and beneficiary, but also the effect of the proof of lack of full valuable consideration for the releases. The defendant was evidently the favorite child. * * * And it is evident that the mother's affection and preference for him and his grew from her happy home life with him and his wife and their eight growing children, during the ten years of her widowhood. It would be strange had it been otherwise, and that she was influenced by affection and gratitude is legitimate. * * * She was free to do as she chose with her life income, and that she gave it to the defendant under the circumstances is not extraordinary. The like is very common and is to be expected. To find fraud or undue influence therefrom would seem to be contrary to the probable truth. Reasons for the making of the releases being so apparent, it would not do to find fraud or undue influence from the mere trust relation. The mother was very old, it is true, but all the evidence shows that she was intelligent, free to come and go, and betrayed no mental failing." This decision was affirmed in 34 App.Div. 144, 54 N.Y.S. 523, 525, where the court said: "Counsel for the plaintiffs concedes that great affection is always a sufficient explanation of testamentary dispositions. If its existence is satisfactorily proved,—and we cannot say that it was not so proved in this case,—we are unable to see why it may not also suffice to remove all suspicion of unfairness concerning dealings inter vivos, by which property rights are affected." In Lefurgy v. Lefurgy, 183 App.Div. 502, 505, 169 N.Y.S. 970, 973, the court said: "The relations of the parties were such that very slight evidence was required to do away with any presumption of wrongdoing * * *."

The potential evil consequence of establishing a legal rule—the fact that it may cause undesirable litigation—constitutes a factor—which Dean Green calls "the prophylactic or preventive factor" [8]—always to be judicially considered. In Mackall v. Mackall, 135 U.S. 167, 172, 10 S.Ct. 705, 707, 34 L.Ed. 84, where the facts somewhat resembled those in the case at bar, the court said: "It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary dispositions, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them." [9] To reverse the judg-

---

[7] Cf. Demogue, loc. cit. 394, 413, 570; Chrestensen v. Valentine, 2 Cir., 122 F. 2d 511, 522, 523; Chappell v. Ellis, 123 N.C. 259, 31 S.E. 709, 711, 68 Am.St.Rep. 822.

[8] Green, loc. cit. 77, 111.

[9] In Sawyer v. White, 8 Cir., 122 F. 223, 225, the court, in deciding that a deed from father to son should not be set aside said: "For 15 years the father had been a paralytic, and his son had been kind, attentive, and watchful of his interests, his welfare, and his comfort. For this kindness and attention the father was grateful to the son. He had implicit confidence in his ability, his integrity, and his judgment.

He had intrusted his business and his property to his care for many years, and for at least ten years he had intended to give him his property when he should pass away. He made the deed here in question to effectuate this intention. There is no doubt that he was influenced to do so by his affection for and confidence in his son, and by his gratitude to him for his years of devotion and service. But *hatred or indifference is not indispensable to the validity of a gift, nor is gratitude or affection for the grantee fatal to it.* The undue influence which will avoid a deed or will is an unlawful or fraudulent influence which controls the will of the grantor or testator.

ment here would be to encourage suits, disruptive of decent family relations, prompted by "that insidious insistence of disappointed relatives that a preferential donation or bequest of property should be regarded with suspicion when induced by considerable attentions and tender manifestations of the beneficiary toward the benefactor"; it would tend to "transform exhibitions of affection into sinister hypocrisy and needed attentions and helpfulness by a near relative to the aged into a badge of fraud."[10]

 The New York cases above cited are in accord with those views. We find no other decisions of the New York courts indicating any inclination to ignore such wise considerations. The cases on which plaintiff relies are not in point. In Allen v. La Vaud, 213 N.Y. 322, 107 N.E. 570, 572, a "dependent parent" was suffering from a disease which "to some extent affected his mind";[11] here, as noted above, we have a finding, supported by the evidence and not disputed by plaintiff, that the decedent "was alert mentally, and in full possession of her faculties, and was not in any way affected mentally by her physical condition at and before" the time when "she executed the assignment." In Boyd v. De La Montagnie, 73 N.Y. 498, 29 Am. Rep. 197, the trial judge found that the wife, misled by her husband into believing that she was liable for a debt, conveyed her property to him in order to delay creditors; on appeal it was held that these findings, sufficiently supported by the evidence, would not be disturbed. In Nesbit v. Lockman, 34 N.Y. 167, the benefi-ary was no relative of the donor but a clerk in her attorneys' office.[12] In Matter of Will of Smith, 95 N.Y. 516, again the beneficiary was no relative of the grantor but the lawyer who drafted her will. In Modlin v. Licht, 224 App.Div. 614, 231 N.Y.S. 265, the parties were co-adventurers, in no way related by blood. In MacLean v. Hart, 141 Misc. 222, 252 N.Y.S. 377, there was no blood relationship. In Blaustein v. Pan American Petroleum & Transport Co., 174 Misc. 601, 21 N.Y.S.2d 651, the suit was by minority stockholders of a corporation against its parent corporation. Generalizations found in the opinions in the foregoing cases must be read in the light of the specific issues there before the court; "asides" in an opinion are not to be taken as authoritative.[13]

In cases of the kind here before us, there is no room for glib, doctrinaire, rulings. Each case must turn on its peculiar facts. The facts here support the decision of the trial court.

Affirmed.

---

The natural influence of the affection of a parent for a child is neither fraudulent nor illegal, and courts will not set aside a deed or a will because it was induced by such an influence unless it appears that this influence was exercised to confuse the judgment and to overcome the free will of the grantor or [the] testator. *Nor is the fact that the grantee or devisee occupies a fiduciary relation to his grantor or testator necessarily fatal to the gift.* It is the use of that relation to secure a deed or devise against the free will or desire of the grantor or donor, and not the mere existence of the relation, that vitiates a grant. It is true that when an unnatural or unreasonable gift or devise is made—such as one by a ward to his guardian, or by a helpless invalid to his nurse, or by a client to his trusted attorney—the presumption at once arises that the fiduciary relation was used to overcome the will of the grantor, and that the deed or devise is voidable. But *when the natural gift of a parent to a loved and trusted child is in question, this presumption is met and overcome by the still stronger presumption that such a gift is the natural and reasonable act of the parent, and that the free will of the donor inspired the grant, uninfluenced by the trust relation."* (Italics added.) See also Turner v. Turner, 31 Okl. 272, 121 P. 616; Betz v. Lovell, 197 Ala. 239, 72 So. 500, 501.

[10] McElroy v. Masterson, 8 Cir., 156 F. 36, 40, 41.

[11] In Kelly v. Kelly, 116 Misc. 195, 217, 189 N.Y.S. 804, 817, "the plaintiff's mind was greatly weakened from illness and anxiety."

[12] The gift there was sustained.

[13] See, e. g., Matter of Green v. Miller, 249 N.Y. 88, 97, 162 N.E. 593; Adamec v. Post, 273 N.Y. 250, 257, 7 N.E.2d 120, 109 A.L.R. 1110; Gwynne v. Board of Education, 259 N.Y. 191, 196, 181 N.E. 353; Hogan v. Board of Education, 200 N.Y. 370, 373, 93 N.E. 951; Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 339, 340, 5 L.Ed. 257; Commissioner v. Marshall, 2 Cir., 125 F.2d 943, 948, 141 A.L.R. 445; Perkins v. Endicott Johnson Corporation, 2 Cir., 128 F.2d 208, 214; Moore and Ogleby, The Supreme Court, Stare Decisis and Law of the Case, 21 Tex. L.Rev. (1943) 514.