198 F.2d 690
 R. H. JOHNSON & CO. et al.
v.
SECURITIES & EXCHANGE COMMISSION et al.
 No. 267.
 Docket 22353.
 United States Court of Appeals Second Circuit.
 July 10, 1952.
 Writ of Certiorari Denied October 20, 1952.
 
 See 73 S.Ct. 94.
 Petition for review of an order of the Securities and Exchange Commission.
 Affirmed.
 The facts are stated in the opinion and findings of the Securities and Exchange Commission. See Securities Exchange Act Release 4694. Those findings include the following:
 "R. H. Johnson & Company (`applicant'), a partnership registered as a broker and dealer under Section 15(b) of the Securities Exchange Act of 1934 (`the Act'), has sought review pursuant to Section 15 A(g) of the Act [15 U.S.C.A. §§ 78O, 78O-3] of an order of the National Association of Securities Dealers, Inc. (`NASD') entered on January 15, 1951, expelling applicant from membership in the NASD.[1]
 "A complaint dated November 16, 1949, was issued by the District Business Conduct Committee of District 14 of the NASD charging violations of Sections 1 and 2 of Article III of the NASD Rules of Fair Practice by applicant, by two of its partners, Roland H. Boardman and John D. Freeman, and by a salesman, Caswell Sharpe.[2] The District Committee, after hearing, found that applicant and the others had violated these rules in that, for the purpose of obtaining profits for themselves, they had induced trading activity in a customers' account during the period from May 25, 1943, to March 3, 1949, which, in view of the financial resources and character of the account, was excessive in volume and in frequency. It ordered the expulsion of applicant from membership in the association and revocation of registration with the association of the others as registered representatives of applicant. Upon review by the NASD Board of Governors, applicant's expulsion and the revocation of Sharpe's registration were affirmed, and the disciplinary action with respect to Boardman and Freeman was reduced to suspension from registration for one year. In addition, the Board found that Rupert H. Johnson, applicant's principal partner, and Boardman, Freeman, and Sharpe were causes of the order expelling applicant from membership in the NASD. Applicant has sought review of the action taken against it, and a request for review has been filed by Johnson in so far as such action and the NASD's finding affect him individually. * * * The * * * over-trading was effected in a joint account of an elderly widow and her daughter, neither of whom had any financial or business background.[3] The widow's investments had previously been handled by a relative, and after his death Sharpe, who at that time was a securities salesman for another firm, successfully solicited her account and gained her trust and confidence. He became a salesman in applicant's Boston office in 1942, bringing the account with him, and from May 25, 1943, when the account became a joint one, until March 3, 1949, the customers placed with Sharpe for investment a net of $57,776 in cash and securities. With these assets Sharpe effected a total of 648 transactions consisting of 348 purchases and 300 sales, in a gross amount of $1,011,678. The securities acquired in 208 of the purchase transactions were sold within six months of acquisition, while those acquired in 68 other purchase transactions were sold within a year. Thus, more than 79% of the purchases were reversed within one year. Only the securities acquired in 35 purchases, of which 20 were effected as recently as 1948 and 1949, remained unsold at the end of the six-year period.
 "The following table shows the average length of time securities purchased in the years indicated were held before being sold (excluding those still held as of March 3, 1949) and the rate of turnover, for each year, of the average amount of cash which had been invested in the account by the customers.[4]
 Average
 Holding Rate of
 "Year Period Turnover

 1943 (from May 25) ....... 5.0 mos. 1.47
 1944 ..................... 4.6 2.35
 1945 ..................... 5.0 3.29
 1946 ..................... 7.6 1.99
 1947 ..................... 7.4 .83
 1948 ..................... 3.5 .82
 "Another feature of the trading in the account was that almost one-third of the purchases were made between a dividend declaration date and the ex-dividend date. The customers believed they were receiving extra income, but the dividends were in effect merely a return of capital which had been purchased with the attendant expense of commissions and other costs.
 "At March 3, 1949, when the customers closed their account, securities worth $31,700 remained of the $57,776 in cash and securities invested, indicating a loss of $26,076, of which $8,733 had been realized. * * * Had these customers, instead of placing their account with applicant, simply continued holding the securities they originally owned, their account on the date it was closed would have shown an increased market value of about $2,663.[5]
 "Applicant realized commissions and profits on this account totalling $23,354. Although almost all of the transactions were in listed securities, only $1,852 represented commissions on agency transactions while $21,502 were profits derived from sales to the customers by applicant as principal. Sharpe received 50% of these commissions and profits realized by applicant. Over the six-year period, 33% of Sharpe's income was derived from this one account, and in one year it provided over 47% of his income. The following table shows for each year the number of transactions effected in the account, the percentage of Sharpe's income derived therefrom and the profit or loss realized by the customers:
 Profit or
 Number of Percent of (Loss)
 Transactions Sharpe's Realized by
 "Year Income Customers

 1943 (from May 25) .......... 63 35.8 ($ 965.92)
 1944 ........................ 141 47.8 585.34
 1945 ........................ 179 35.7 9,244.39
 1946 ........................ 138 34.8 ( 3,972.89)
 1947 ........................ 57 24.0 ( 7,345.48)
 1948 ........................ 66 20.3 ( 5,889.50)
 1949 (to March 3) ........... 4 9.9 ( 388.91)
 "Applicant has conceded that there was substantial overtrading in the account, that the account suffered substantial losses, and that Boardman and Freeman failed adequately to supervise the transactions recommended to the customers by Sharpe. However, applicant contends that responsibility for the overtrading cannot be attributed to it. It argues that primary responsibility lies with Sharpe while any derivative responsibility goes only as far as Boardman and Freeman who, as resident partners in the Boston office, assertedly had complete control over Sharpe's trading in the account. The NASD, on the other hand, has argued that Boardman and Freeman were not actually partners but only supervisory employees, and that while it is immaterial, as far as applicant's responsibility is concerned, whether Boardman and Freeman were partners or not, their subordinate status in the firm is significant with respect to Johnson's duty, as the dominant partner, to supervise the Boston office.
 "Johnson, as the dominant partner, must have known that Boardman and Freeman would have little time to devote to supervision of the activities of the salesmen in the Boston office, who, as noted above, serviced about two to four thousand accounts. Boardman and Freeman were permitted to handle their own accounts, receiving a commission of 50% thereon like the other salesmen, and they were frequently away from the office on firm business. Boardman normally was in his office about 15 hours out of a work week of 39 hours, spending three days a week at other sales offices of applicant, while Freeman was in his office about 25 hours a week.
 "Moreover, the record shows that supervision of the salesmen in the Boston office was primarily the function of the New York office where Johnson maintained his headquarters. The accounting system of the firm was such that the only permanent records were in the New York office. The daily sales sheets were prepared in New York showing all transactions for the day in all of the offices, and the customers' ledger was kept in New York. Whenever accurate and complete information as to an account was required by the Boston office, a transcript taken from the customers' ledger in New York would be supplied. To the extent that there was compliance with Section 27(a) of Article III of the NASD's rules which requires supervision of salesmen including review and approval of all sales by a partner, executive of branch manager evidenced by written endorsement of sales memoranda, it was carried out in New York. However, such endorsement in applicant's case, in the form of initialing of the sales memoranda frequently was done by employees rather than a partner or executive and merely purported to indicate that the transactions were accurately set down and that the spread was reasonable. But the endorsement did not purport to signify that the transactions had been approved as being suitable for the customer. It is clear, therefore, that although the New York office was responsible for revising securities transactions, such limited check as was actually made was not designed and was ineffective to detect excessive trading."
 Judd & Gurfein, New York City (Orrin G. Judd, New York City, Ganson Purcell, Washington, D. C., Ernest Angell, New York City, and Charles E. McGuinness, Brooklyn, N. Y., of counsel), for petitioners.
 Roger Foster, Sol., Washington, D. C., S. E. C., Louis Loss, Washington, D. C. (Ellwood L. Englander, Philadelphia, Pa., and Henry L. Stern, Chicago, Ill., of counsel), for Securities and Exchange Commission.
 Howard C. Westwood and Donald Hiss, Washington, D. C. (John W. Lindsey, Roanoke, Va., Covington & Burling, Washington, D. C., of counsel), for NASD.
 Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.
 FRANK, Circuit Judge.
 
 
 1
 1. The petitioners argue that, in addition to reviewing the Commission's order, we must review the conduct and opinion of the NASD. We think not. For Section 25(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78y, which affords the sole basis of any judicial review, refers to a Commission order only. Moreover, Section (h)(1) of the so-called Maloney Act — i. e., Section 15A of the Securities Exchange Act[6] — provides as follows: The Commission shall review disciplinary action taken by a "registered securities association"; in doing so, the Commission shall conduct a hearing of its own and shall consider not only "the record before the association" but also "such other evidence as it may deem relevant"; it shall make its own finding as to whether the disciplined member has done or omitted such acts "as the association has found him to have engaged in or omitted"; the Commission shall then determine for itself whether the act or omission violated such rules of the association "as have been designated in the determination of the association"; the Commission must also determine and declare whether the act or omission constitutes "conduct inconsistent with just and equiable principles of trade, and shall so declare"; and the Commission shall find whether the penalty imposed by the association is "excessive or oppressive, having due regard to the public interest," and, if so, it shall, by order, "cancel, reduce, or require the remission of such penalty." We think that those provisions call for (1) de novo findings by the Commission, (2) the hearing (as here) by the Commission of further evidence if necessary, and (3) an independent decision by the Commission as to the charges and penalty; these matters alone are subject to our review. We conclude that we may consider any errors in the proceedings of the association only if and to the extent that they infected the Commission's action by leading to errors on its part.
 
 
 2
 2. We perceive no such errors. Having considered the record as a whole, we hold that there is ample substantial evidence to sustain the Commission's findings, which, in turn, fully justify the conclusion that the firm was guilty as charged.
 
 
 3
 Petitioners, however, contend that the association's opinion contains references to matters not relevant to those charges. The Commission suggests that those references be regarded as dicta. Much can be said for that suggestion: Many court opinions abound with similar "asides", not pertinent to the accompanying decisions, yet no one supposes that the decisions are therefore invalid; it would be strange, then, were a court to invalidate an order by a body of non-lawyers because the order is accompanied by an opinion which imitates the verbal habits of the judiciary. But far more important, the Commission, in its own independent findings, ignored such irrelevant matters. True, lack of supervision and violation of the association's Rule 27 (a)[7] were not charged. But the Commission properly took them into account in their bearing on the specific charges brought against the firm and on the duties of the Commission in the circumstances.[8]
 
 
 4
 3. In the light of the statutory provisions concerning (a) the Commission's power, according to reasonably fixed statutory standards,[9] to approve or disapprove of the association's Rules, and (b) the Commission's review of any disciplinary action, we see no merit in the contention that the Act unconstitutionally delegates power to the association.[10]
 
 
 5
 4. Johnson petitioned the Commission to review the action of the association "insofar as said action or the findings" related to him individually. The Commission did so. It found that he was "a cause" of the order expelling the firm. He now urges that the association filed no charges against him. But, as he did not make this point until he reached this court, we may not deal with it; for Section 25 provides, "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission."
 
 
 6
 5. Johnson argues that the record contains no substantial evidence to support the finding that his conduct was a "cause" of the firm's expulsion within the meaning of Section 15A(b)(4)(C).[11] We do not agree. There is ample evidence (1) that he had complete control of all persons in the organization including the other partners (who were such in little more than name) and (2) that he signally failed to provide any adequate supervision although his extensive control put upon him that responsibility. He contends, however, that such failure does not make him a "cause," because, he says, "cause" must always be interpreted to mean "an immediate or inducing cause," with the result here that a "cause" cannot consist of anything "back of the employee or associate who was guilty of the violation."
 
 
 7
 We reject that interpretation. It involves the "familiar one-word-one-meaning (or `pigs is pigs') fallacy",[12] grounded on reasoning which "would compel the conclusion that a clotheshorse is an animal of the equine species, and make it impossible to speak of drinking a toast."[13] It overlooks the context[14] in which the word "cause" is used, i. e., a statute explicitly concerned with adherence to "just and equitable principles of trade."[15] Johnson's interpretation would encourage ethical irresponsibility by those who should be primarily responsible for such adherence.[16] If Johnson's contention were sound, then, in order to circumvent those principles, a person controlling a firm would merely have to arrange to leave wholly unsupervised its employees who deal with customers. We think Johnson's irresponsible behavior with respect to supervision amounted to such recklessness as to justify the finding that he was a "cause"[17] of the firm's expulsion.[18]
 
 
 8
 6. We think that, in passing upon the penalty, the Commission properly considered previous disciplinary action taken against the firm by the association and by the New York Stock Exchange. We think the Commission did not abuse its discretion in not setting aside the penalty fixed by the association. Assuming, arguendo, that we may go further and decide whether or not the penalty was excessive, we hold that the penalty was not incorrect.[19]
 
 
 
 Notes:
 
 
 [1]
 "Section 15A(g) provides in part: `If any registered securities association * * * shall take any disciplinary action against any member * * * such action shall be subject to review by the Commission * * * upon application by any person aggrieved thereby * * *.'
 
 
 [2]
 "Sections 1 and 2 of Article III of the NASD Rules of Fair Practice provide: 1. A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade. 2. In recommending to a customer the purchase sale or change of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."
 
 
 [3]
 "It was pointed out in oral argument that no investigation was made by the NASD to determine whether excessive, trading occurred in accounts other than the one involved in these proceedings."
 
 
 [4]
 "The rate of turnover shown is the relationship between cost of purchases made in each year and the average of the balance of cash which had been invested as of the beginning and end of each year, including proceeds of sales of securities put into the account by the customer. For the first year, the year-end balance was used in place of an average. The record does not contain a computation of the rate turnover in terms of the average value of the securities held in the account. If the turnover were computed on such basis, it appears that although the rate might be lower than indicated for the earlier years of the table, it would probably be higher for 1947 and 1948. The latter conclusion is indicated by the fact that while the balance of cash invested in the account increased from $39,274 at the end of 1943 to an average of $58,133 in 1948, the value of the securities held in the account had fallen to $31,700 by March 3, 1949."
 
 
 [5]
 "It was pointed out at the oral argument that since the time the account was closed the market value of the securities then held would have increased to approximately $50,000 in October 1951 (less $5,300 representing a loan used to purchase securities for the account), so that a large part of the customers' losses may have been recouped. However, this increase in market prices would not of course affect the validity of any finding that the account was mishandled during the period involved in this proceeding. And of course, the market rise would have similarly affected the value of the securities held originally so that, if they had merely been retained, their value in October 1951 would have been approximately $83,000, representing a gain of $26,000."
 
 
 [6]
 15 U.S.C.A. § 78o-3.
 
 
 [7]
 Rule 27(a) provides that each sale by a salesman "shall be approved by a partner, duly accredited executive or branch manager * * * by a written endorsement made upon a copy of a memorandum of such sale" which shall be "made a part of the permanent records of such member."
 
 
 [8]
 Lack of supervision bore directly on the issue whether Johnson was a "cause" of the order expelling the firm; see infra for discussion of that issue
 As the Commission said in its opinion, violation of Rule 27(a) was relevant in connection with the firm's contention that responsibility for supervising the Boston salesmen was lodged solely in Boardman and Freeman.
 
 
 [9]
 Cf. Charles Hughes & Co. v. S. E. C., 2 Cir., 139 F.2d 434
 
 
 [10]
 See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L. Ed. 1263; Opp Cotton Mills v. Administrator of Wage and Hour Division, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624
 The contention is especially unsound since a violation of any of those rules cannot result in criminal punishment. Cf. Rice v. Chicago Board of Trade, 331 U.S. 247, 253-254, 67 S.Ct. 1160, 91 L.Ed. 1468.
 
 
 [11]
 It provides that no broker or dealer shall be continued in membership in an association if "by his conduct while employed by, acting for, or directly or indirectly controlling or controlled by, a broker or dealer, (he) was a cause of" any suspension or expulsion "which is in effect with respect to such broker or dealer."
 
 
 [12]
 Irwin v. Simmons, 2 Cir., 140 F.2d 558, 560
 See Cook, The Logical and the Legal Bases of the Conflict of Laws (1942) 159: "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them runs all through legal discussions. It has all the tenacity of original sin and must be constantly guarded against."
 
 
 [13]
 United States v. Forness, 2 Cir., 125 F.2d 928, 932
 
 
 [14]
 See Hoffman v. Palmer, 2 Cir., 129 F. 2d 976, 984; "In a given context, words often come to have a meaning which they do not have in other contexts. What `apostles' mean in an admiralty rule would surprise a theologian. To a mathematician, pi is not a Greek letter * * * `Unearned' in the insurance trade, as used in connection with premiums, does not indicate what it does mean to a man on the street."
 See 3 Corbin, Contracts (1951): "A specific word or a particular phrase often appears in two very different statutes, enacted for very different purposes. To assume that the word or phrase must be given the same meaning in the two statutes is an egregious error" (p. 91). "To elucidate the meanings of the word `mean' requires fourteen long columns of fine print in the Oxford dictionary" (p. 70). "Words have no meaning; it is users of words who give them meaning" (p. 58). Corbin says there is no "one true meaning of" the phrase "one true meaning" (p. 17).
 See Holmes, The Theory of Legal Interpretation, 12 Harv.L.Rev. (1899) 417: "It is not true that in practice (and I know of no reason why theory should disagree with the facts) a given word or even a given allocation of words has one meaning and no other." See also Williams, Language and The Law, 61 L. Q.Rev. (1945) at 384-388.
 That the problem of "context" in interpretation is not peculiar to lawyerdom, see Frank, Book Review, 61 Yale L. J. 1108, 1112 (1952).
 
 
 [15]
 For the history of the phrase in the rules of the Exchanges and in judicial decisions, see National Ass'n of Dealers, Inc., 19 S.E.C. 424, 484-485, and cases there cited
 Cf. 3 Corbin, Contracts (1951) 57: "A word appearing suddenly, in empty space and with no history, would express nothing at all."
 
 
 [16]
 The Commission, in several earlier cases, each involving its own proceedings to determine whether the registration of a broker-dealer should be revoked for fraudulent conduct, has held that a broker-dealer firm, with a large organization, cannot relieve itself of responsibility for its subordinates' violations by neglecting their adequate supervision. See Bond v. Goodwin, Inc., 15 S.E.C. 584, 601; E. H. Rollins & Sons, Inc., 18 S.E.C. 347, 391-392
 
 
 [17]
 It is of interest that apparently the scientific and philosophic notions of "cause" originally derived from the usages of the Greek law courts where "cause" (aitia) denoted responsibility. Myres, The Beginnings of Science, in the volume, Science and Civilization (1923, Marvin ed.) 7, 21-22, after so explaining, adds: "Just so in Latin, the corresponding word `causa' itself comes into metaphysics from the law courts." Myres notes that "causam dicere," in the courts, meant "to find out who is responsible for what happens." See also Jaeger, Paideia, Vol. I (1939) 159; Kelsen, Nature and Society (1943) 248, 263, 379 n. 97.
 Mention of this history does not mean that we think that "cause" in Section 15A is equated with respondeat superior.
 We need not and do not decide that nothing less than recklessness will add up to "cause."
 
 
 [18]
 Petitioners quote Bacon's maxim concerning "cause." N. St. John Green, tracing the origins of this maxim, shows the influence of Aristotle, and of his scholastic disciples, on the idea of "proximate" and "remote" cause. Green demonstrates the ambiguity of this locution. In legal usage, he says, the "chief difficulty * * * is that the term proximate and the term remote have no clear, distinct, and definable significations. * * * The division is neither scientific nor logical * * * Above all, it is not a fixed or constant division. It varies in different classes of action." Green, Proximate and Remote Cause, 4 Am.L. Rev. (1870) 201, reprinted in Green, Essays on Tort and Crime (1933) 4-15, and discussed in Wiener, Evolution and The Founders of Pragmatism (1940) Ch. 7
 
 
 [19]
 As the Commission said, the expulsion of the firm "will not necessarily be permanent." See Loss, Securities Regulations (1951) 742-743