**Howard J. SHULTZ, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent.**

No. 78–2346.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1979.

Decided Jan. 7, 1980.

---

Jeffrey R. Liebman, Chicago, Ill., for petitioner.

Elisse B. Walter, Securities and Exchange Commission, Washington, D. C., for respondent.

Before SWYGERT and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

SWYGERT, Circuit Judge.

This appeal arises from a final order of the Securities and Exchange Commission ("the Commission") affirming the disciplinary action taken by the Chicago Board Options Exchange, Inc. ("Exchange") against petitioner, Howard J. Shultz. The issues presented are:

1. Should the Commission's decision be reversed because of bias or the appearance of unfairness in the hearing granted petitioner by the Exchange?

2. Was there sufficient evidence to support the findings of the Commission?

3. Is Exchange Rule 8.7(a) unconstitutionally vague, and can Rules 4.1 and 8.7(a) be violated without the violation of another rule?

The Commission made an independent determination that petitioner had violated the Exchange rules. We find there was ample evidence to support its findings. Given the delicately-balanced position of a professional market maker, trading for his own account on the Exchange, we hold that Rule 8.7(a) is not unconstitutionally vague and that Rules 8.7(a) and 4.1 do not require the violation of another rule. Accordingly, the Commission's order is affirmed.

I

On July 19, 1976, the Business Conduct Committee of the Exchange initiated disciplinary proceedings against Howard Shultz, a registered market maker, and three other Exchange market makers. A market maker is a member of the Exchange who buys and sells options for his own account, in contrast to a broker member of the Exchange who acts as an agent for public investors by executing option trades on their behalf. The function of the market maker is to aid in maintaining a stable market by engaging in options transactions during temporary gaps in public supply and demand for options.[1]

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. Congress has given the Commission broad regulatory authority over market makers and other specialists. Section 11(b) of the Securities Exchange Act, *as amended* § 15 U.S.C. 78k(b), provides:

When not in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the

Shultz and the three other market makers were charged with violating Exchange Rule 4.1, requiring market makers to refrain from conduct inconsistent with just and equitable principles of trade; Exchange Rule 8.7(a), requiring market makers to engage in dealings reasonably calculated to contribute to the maintenance of a fair and orderly market and forbidding transactions that are inconsistent with that purpose; and Exchange Rule 4.2, prohibiting conduct in violation of another rule.[2]

These charges were based on a series of circular transactions engaged in by petitioner and the other market makers on three separate days, transactions which left each in exactly the same position he had been in prior to the trades.[3] Each market maker

public interest and for the protection of investors, to maintain fair and orderly markets, or to remove impediments to and perfect the mechanism of a national market system, the rules of a national securities exchange may permit . . . a member to be registered as a specialist. Under the rules and regulations of the Commission a specialist may be permitted to act as a broker and dealer or limited to acting as a broker or dealer.

According to the Commission's regulations, an exchange may not permit specialists to act as dealers (who buy and sell for their own accounts) unless exchange rules restrict their "dealings so far as practicable to those reasonably necessary to permit [them] to maintain a fair and orderly market . . . ." 17 CFR 240.11b–1.

**2.** The Exchange rules, at the time of Shultz's hearing, provided:

*Rule 4.1.* No member shall engage in conduct or proceedings inconsistent with just and equitable principles of trade. The willful violation of any provision of the Securities Exchange Act of 1934 or any rule or regulation thereunder shall be considered conduct or proceeding inconsistent with just and equitable principles of trade.

*Rule 4.2.* No member shall engage in conduct in violation of the Constitution or the Rules or the Rules of the Clearing Corporation, or any written interpretation thereof. Every member shall so supervise its employees to assure compliance therewith.

*Rule 8.7(a). General.* Transactions of a Market-Maker should constitute a course of dealings reasonably calculated to contribute to the maintenance of a fair and orderly market, and no Market-Maker should enter into transactions or make bids or offers that are inconsistent with such a course of dealings.

The four market makers were also charged with violating CBOE Rule 4.7 but the decision of the Committee found Shultz in violation only of Rules 4.1, 4.2 and 8.7(a). Because the allegation of a Rule 4.7 violation was dismissed, that Rule, which is set out below, does not concern us in this appeal.

*Rule 4.7.* No member shall effect or induce the purchase, sale or exercise of any option contract for the purpose of creating or inducing a false, misleading, or artificial appearance of activity in such security or in the underlying security, or for the purpose of unduly or improperly influencing the market price of such security or of the underlying security or for the purpose of making a price which does not reflect the true state of the market in such security or in the underlying security.

**3.**

SUMMARY OF EASTMAN KODAK
OPTION TRANSACTIONS

| | Date | Time CST p.m. | Seller | Buyer | Price [of Option] | Price of Underlying Security [on Primary Market] |
|---|---|---|---|---|---|---|
| Last Prev. Transaction | 3/3 | 12:00 | | | 23 | 107–3/8 |
| | 3/3 | 3:08 | X* | Y* | 22–1/8 | 107–3/8 |
| | 3/3 | 3:09 | Y | Shultz | 22–1/8 | 107–1/4 |
| | 3/3 | 3:09 | Shultz | X | 22–1/8 | 107–1/4 |
| Last Offer | 3/3 | 3:09 | | | 21–1/2 | 107–1/4 |
| Net Change | | | | | –1–1/2 | –1/8 |

purchased from and sold to another of the market makers a single Eastman Kodak "July 90" call option contract at the same price within an interval of one to two minutes. On each of the three occasions, the price at which the transactions were consummated was lower by $7/8 or $1 than the previous sale price for the option series. On each occasion the price of the security underlying the option varied by $1/2 or less on the New York Stock Exchange, its primary market.[4] In each instance the circular trade was followed by an offer to sell which further lowered the price of the option. Because no one purchased at the lower price, that offer to sell became the "final" offer at which the options market closed.

Petitioner Shultz and at least one of the other market makers who participated in the circular trades were "short" with respect to the option series.[5]

Having found probable cause that a violation of the Exchange's rules had occurred,

the Business Conduct Committee of the Exchange ordered disciplinary proceedings against the four market makers engaged in the circular trades. Shultz requested an evidentiary hearing. The remaining three market makers submitted offers of settlement which were accepted by the Business Conduct Committee, in which the allegations were neither admitted nor denied.

Six days prior to the hearing scheduled before the Committee, Shultz requested dismissal of the Exchange proceedings. In a letter to the Committee, Shultz' counsel stated that the proceedings had the appearance of unfairness and lacked due process because the Committee had accepted a settlement from John Moffat, one of the market maker respondents, which was conditioned on Moffat receiving no greater sanction or fine than that imposed upon "any of the other respondents" in this proceeding. Petitioner's request for dismissal was grounded on the assertion that the settlement provision required the Committee to

| | Date | Time CST p.m. | Seller | Buyer | Price [of Option] | Price of Underlying Security [on Primary Market] |
|---|---|---|---|---|---|---|
| Last Prev. Transaction | 3/24 | 12:44 | | | 30 | 117–1/2 |
| | 3/24 | 3:05 | Z* | Y | 29 | 117 |
| | 3/24 | 3:05 | Y | Shultz | 29 | 117 |
| | 3/24 | 3:05 | Shultz | Z | 29 | 117 |
| Last Offer | 3/24 | 3:05 | | | 28–3/4 | 117 |
| Net Change | | | | | –1–1 1/4 | –1/2 |
| | | | | | | |
| Last Prev. Transaction | 3/25 | 2:40 | | | 29–1/4 | 116 |
| | 3/25 | 2:54 | Z | Shultz | 28–1/4 | 115–3/4 |
| | 3/25 | 2:55 | Shultz | Y | 28–1/4 | 115–3/4 |
| | 3/25 | 2:55 | Y | Z | 28–1/4 | 115–3/4 |
| Last Offer | 3/25 | 3:09 | | | 28 | 116–1/4 |
| Net Change | | | | | –1–1 1/4 | + 1/4 |

\* "X," "Y," and "Z" represent the other three market makers involved in the transactions.

---

4. According to Rule 8.7(b)(ii), a market maker can bid "no more than $1 lower and/or [offer] no more than $1 higher than the last preceding transaction price for the particular option contract. However, this standard shall not ordinarily apply if the price per share (or other unit of trading) of the underlying security has changed by more than $1 since the preceding transaction for the particular option contract."

5. To be "short" in the context of options means to have sold options not yet purchased. One way to eliminate a short position is to purchase an option contract.

impose upon Shultz a sanction and fine at least as great as Moffat's or, if it were to find no rule violations on the part of Shultz, having to reduce or eliminate the sanction already imposed on Moffat and announced to the media. Moffat had already served his suspension and paid his fine.

On receipt of the letter, Bruce Simpson, a member of the Committee, contacted prosecutor James Moylan and instructed Moylan that he or the Committee counsel were to poll the other members of the Committee in regard to Shultz' motion. Moylan subsequently advised Simpson that the majority opinion of the Committee was to deny petitioner's motion, and Moylan alone drafted the Committee's response, which was signed by the Committee counsel. The response stated that the offers of settlement would in no way influence the conduct of the Committee toward Shultz and that the Moffat settlement clause referred only to other respondents submitting settlement offers, not to a respondent who chose to have the Committee hear the charges against him.

On December 7, 1976, a hearing was held before the Business Conduct Committee, at which Shultz was represented by counsel. At the outset of the hearing Shultz renewed his dismissal request, stating that there was prejudgment and alleging that the drafting of the Committee's response to his initial dismissal request by prosecutor Moylan constituted impermissible commingling of the prosecutorial and adjudicatory functions.

Moylan stated that he had negotiated the settlement of the charges against Moffat, and that though the settlement provision upon which Shultz based his dismissal request stated that Moffat would not be penalized more severely than any other respondent, the provision pertained solely to the respondents who submitted settlement offers. Moylan stated further that he had drafted the letter denying Shultz' request

for dismissal at the direction of the Committee after the decision had been made. The Committee decided to proceed with the hearing, reiterating that a decision was to be made based solely on what was presented at the hearing.

The Exchange's Director of Investigations presented documentary evidence establishing Shultz' participation in the circular trades. Shultz testified that he had been a professional in various phases of the securities industry for eleven years and that as a market maker, he considered himself a scalper.[6] He admitted engaging in the transactions at issue, but he stated that the pattern of circular transactions—purchase and sale of an option contract within the space of one or two minutes—was consistent with his trading patterns which frequently included "scratched trades."[7] Because of his daily volume of trades, petitioner stated he had no independent recall of the trades in question. He testified that none of the other market makers engaged in these transactions were his personal friends and that he had no acquaintance with them off the floor of the Exchange. He denied either soliciting or being solicited concerning these transactions. Petitioner also stated that because of the profitable nature of his business, he had no pressing need for money at the time of these transactions. When asked by various members of the Business Conduct Committee for an explanation of his reasons for entering into both a transaction to sell and a transaction to buy at the same price ($7/8 to $1 lower than the previous sale price for the option series) and then choosing not to buy again at the subsequent lower offer made immediately after these transactions, Shultz offered no explanation.

Bernard Carey, a board broker assigned to Polaroid options, Chairman of the Floor Officials Committee, and a member of the Board of Directors of the Exchange, testi-

---

6. A scalper seeks to profit by taking advantage of changing market conditions which will affect prices of options before those conditions become manifest in the market.

7. "Scratched trades," sometimes called reverse trades, were defined by the Business Conduct Committee as "a purchase and sale of the same quantity of an option series at the same price during the same day."

fied as a witness for Shultz. He said that he had never seen the "triple reverse" pattern presented by the trades in question nor had he seen a scratch trade between market makers during closing rotation. Carey indicated that, if he had seen a triple reverse in Polaroid followed by a lower offer that was allowed to stand, he would have reported the transaction.[8] Gerald Wood, a floor broker in Eastman Kodak options and a member of several committees including the Floor Officials Committee, was also a witness for Shultz and stated that a series of transactions such as the ones in question would be an abnormal occurrence which he had never seen. Wood testified that, had he been aware of the pattern of the transactions when they occurred, he would have tried to stop them. Scott Schwab, a market maker in Polaroid options, testified that he frequently scratched trades, but had never seen a series of transactions like those in question.

In its decision the Business Conduct Committee found that Shultz had entered into the transactions alleged, and that the trades were not legitimate scratch trades or trades where prevailing market conditions could justify reversal of one's position. According to the Committee, trades involving only one lot, at or near the close of trading where a second trade was made with the same individual within a short time period, would have the appearance of impropriety. In this case, the Committee stated, there was in addition a pattern of transactions over a number of days in an illiquid series involving the same individuals with no change in their relative option position and no other apparent purpose but to influence the price of the last sale in that option series; the Committee found such activity to be "clearly improper."[9] The Committee held that because the transactions at issue were the last transactions of the day and because they preceded the final offer and moved the option down the maximum amount the option could be moved under Rule 8.7(b)(ii), and yet there was not a corresponding change in price of the underlying security, and an offer lower than the last sale did not result in a transaction; the conclusion was inescapable that the trades were in violation of the Exchange rules.[10] Petitioner was found to have entered into transactions which were inconsistent with just and equitable principles of trade and which did not constitute a course of dealings reasonably calculated to contribute to the maintenance of a fair and orderly market, in violation of Exchange Rules 4.1, 8.7, and 4.2.[11] The Committee determined that Shultz did not have the intent to create a false and misleading appearance of activity, so the charge under Rules 4.7 and 4.2 was dismissed.[12] The penalty assessed was a three week suspension and a $2,500 fine.

Shultz petitioned the Board of Directors of the Exchange for review of the Business Conduct Committee's decision pursuant to Exchange Rule 17.9.[13] The Board upheld the Committee's decision in all respects.

8. Exchange Rule 7.6 imposes a duty on board brokers to report any unusual transaction detrimental to the maintenance of a fair and orderly market promptly to a floor official.

9. A "series" of options is all options of the same type covering the same underlying security and having the same exercise price and expiration date.

10. *See* note 4, *supra.*

11. *See* note 1, *supra.*

12. *Id.*

13. Exchange Rule 17.9 provides:
Review
    (a) *Petition.* The Respondent shall have 10 days after service of notice of a decision . . to petition for review thereof. Such petition shall be in writing and shall specify the findings and conclusions to which exceptions are taken together with reasons for such exceptions. Any objections to a decision not specified by written exception shall be considered to have been abandoned and may be disregarded.
    (b) *Conduct of Review.* The review shall be conducted by the Board or a Committee of the Board composed of at least three Directors. Unless the Board shall decide to open the record for the introduction of evidence or to hear argument, such review shall be based solely upon the record and the written exceptions filed by the parties. The decision of the Board shall be in writing and shall be final.

Shultz sought the Commission's review of the Exchange's disciplinary action, pursuant to Section 19(d) of the Securities Exchange Act, 15 U.S.C. § 78s(d).[14] The Commission, after considering briefs filed by Shultz and the Exchange and hearing oral argument, issued an opinion and order affirming the Exchange's disciplinary action. In its opinion, the Commission found the evidence of Shultz' violations "clear and convincing."

## II

■ In reviewing a decision of the Exchange, the Commission makes a *de novo* determination of the facts and the law. The Commission must find that the member charged

> has engaged in such acts or practices, or has omitted such acts, as the [Exchange] has found him to have engaged in or omitted [and] that such acts or practices, or omissions to act, are in violation of such provisions of [the Securities Exchange Act], the rules or regulations thereunder, [or] the rules of the self-regulatory organization . . . .

Section 19(e)(1)(A) of the Securities Exchange Act, 15 U.S.C. § 78s(e)(1)(A). After giving notice and the opportunity for a hearing, which may include the presentation of additional evidence, the Commission makes an *"independent* decision on the violation and penalty." *Todd & Co. v. Securities and Exchange Commission,* 557 F.2d 1008, 1012 (3d Cir. 1977); *R. H. Johnson & Co. v. Securities and Exchange Commission,*

198 F.2d 690, 695 (2d Cir.), *cert. denied,* 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952) (emphasis added).

■ This court does not review actions of the Exchange Committee because Exchange disciplinary actions

> are subject to full review by the Securities and Exchange Commission, a wholly public organ, with a hearing before it if requested, the taking of further evidence it may deem relevant, and a decision based on its own findings.

*Nassau Securities Service v. Securities and Exchange Commission,* 348 F.2d 133 (2d Cir. 1965). Our role is to review the order of the Commission. We will consider errors in the Exchange proceedings "only if and to the extent that they infected the Commission's action by leading to error on its part." *R. H. Johnson & Co. v. Securities and Exchange Commission,* 198 F.2d 690, 695 (2d Cir.), *cert. denied,* 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952).[15] We are persuaded that no such errors occurred here.

■ Petitioner's contention that the clause in Moffat's settlement agreement resulted in a biased hearing is without merit. It was made clear to petitioner and to the Committee on more than one occasion that the language referred only to respondents submitting settlement offers. If the language at first appeared ambiguous, there could be no question about its meaning once it was clarified, and the clarification occurred prior to petitioner's hearing before the Committee.

14. Section 19(d) of the Securities Exchange Act, 15 U.S.C. § 78s(d) provides:

> Notice of disciplinary action taken by self-regulatory organization against a member or participant; review of action by appropriate regulatory agency; procedure
>
> (d)(1) If any self-regulatory organization imposes any final disciplinary sanction on any member thereof or participant therein, . . . ., the self-regulatory organization shall promptly file notice thereof with the appropriate regulatory agency for the self-regulatory organization
>
> . . . .
>
> (2) Any action with respect to which a self-regulatory organization is required by paragraph (1) of this subsection to file notice shall be subject to review by the appropriate

> regulatory agency for such member . . . on its own motion, or upon application by any person aggrieved thereby filed within thirty days after the date such notice was filed with such appropriate regulatory agency and received by such aggrieved person, or within such longer period as such appropriate regulatory agency may determine. . . .

15. Section 25(a)(1) of the Securities Exchange Act, 15 U.S.C. § 78y(a)(1), authorizes judicial review of the Commission's orders, not the Exchange's:

> A person aggrieved by a final order of the Commission entered pursuant to this chapter may obtain review of the *order* in the United States Court of Appeals . . . .

Petitioner next argues that there was a commingling of prosecutorial and adjudicatory functions resulting in a denial of due process and a violation of Section 5(d) of the Administrative Procedure Act, 5 U.S.C. § 554(d).[16] The allegation of commingling of function because prosecutor Moylan allegedly polled the members of the Committee concerning petitioner's motion to dismiss was not made before the Committee, the Board of Directors, or the Commission. Objections not raised before the Commission may not be considered by this court unless there was a reasonable ground for failing to do so. Section 25(c)(1) of the Securities Exchange Act, 15 U.S.C. § 78y(c)(1). No such ground was offered here. Further, the record contains no evidence that Moylan actually polled the members of the Committee, only that he or the Committee counsel were asked to do so.

Petitioner also alleges that there was impermissible commingling of function when Moylan drafted the Committee's response letter denying petitioner's motion to dismiss for bias because of the clause in the Moffat settlement. We cannot agree. The Commission found such action to be ministerial and not a commingling of function. While we note that it would have been preferable for someone other than the prosecutor to draft the letter, we agree with the Commission that the drafting of the letter, once the decision was made, was ministerial and was not an improper commingling of prosecutorial and adjudicatory functions requiring reversal. There was no bias suffered by petitioner because Moylan drafted

the letter; the letter simply recited the Committee's decision that the Moffat settlement did not refer to contesting respondents and would not influence petitioner's case.

The Administrative Procedure Act applies only to an "authority of the Government of the United States . . .." 5 U.S.C. § 551(1). The Exchange is a Delaware non-stock corporation and not an authority of the Government. The Commission, not the Exchange, is governed by the Administrative Procedure Act. There is no allegation that there was commingling of prosecutorial and adjudicatory functions in the Commission proceedings.

### III

The Commission found that the evidence supporting the findings of violations was clear and convincing. We have determined that there was substantial evidence to support the findings of the Commission under the standard used by the Commission.[17]

On each of the three days in question, petitioner and two other market makers engaged in identical transactions. None of the trades was in response to an order by a public customer, and the transactions were in a series that was infrequently traded. The result of the trades in terms of the option was a lowering of the price; but in terms of the positions of petitioner and the other market makers, the result was a nulli-

---

16. Section 5(d) of the Administrative Procedure Act, 5 U.S.C. § 554(d) provides:

.   .   . An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommend decision, or agency review  .   .   .  except as witness or counsel in public proceedings. ·   .   .

17. This court has never held and does not hold today that a clear and convincing standard of proof is required in proceedings like the one at bar. In *Collins Securities Corp. v. SEC*, 183 U.S.App.D.C. 301, 562 F.2d 820 (D.C.Cir. 1977),

cited by petitioner, wherein a clear and convincing standard was used, the violation alleged involved fraud and the penalty was disbarment. In *Whitney v. SEC*, 196 U.S.App. D.C. 12, 604 F.2d 676 (D.C.Cir. 1979), a violation of the anti-fraud provisions of the Securities Exchange Act was found and the clear and convincing standard of proof was used. However, at least one court has explicitly refused to follow *Collins* and did not use the clear and convincing standard in a case which also involved fraud. *Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979). The issue of what standard we would use in a case involving fraud is not before us.

ty—each wound up in precisely the same position he was in prior to the trades.[18] We agree with the Commission that "[c]ircular trades with virtually the same individuals on three occasions do not occur by chance." There was therefore substantial evidence to support the Commission's inference that the transactions were contrived.

Further, the Commission's inference that the transactions served no legitimate economic purpose is also supported by substantial evidence. No such purpose has been suggested by petitioner. There is no dispute that the transactions were in an illiquid option series and at a price lower than the preceding sale price. Each of the three transactions occurred during or near closing rotation and each was followed by a lower offer which was not accepted by any of the market makers. Three experienced options traders testifying for petitioner conceded that these trades were unusual and two stated that, had they witnessed such transactions, they would have attempted to stop them. Under Exchange Rule 8.7(a), petitioner must engage only in transactions reasonably necessary to maintain a fair and orderly market, and under Rule 4.1, must avoid conduct inconsistent with just and equitable principles of trade. The Commission has long made clear that these obligations are affirmative and cannot be met by a showing of no undesirable effect or even no discernable effect. Securities Exchange Act Release No. 1117 (March 30, 1937).[19] Given these affirmative obligations embodied in the Exchange rules, the Commission correctly concluded that three contrived transactions serving no legitimate economic purpose constituted violations of Rules 8.7(a), 4.1, and 4.2.[20]

## IV

■ Finally, petitioner contends that Rule 8.7(a) is unconstitutionally vague and that Rules 4.1 and 8.7(a) cannot be violated without the violation of another rule.[21] These contentions are also without merit.

In *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), cited by petitioner, the Supreme Court invalidated a criminal vagrancy statute for vagueness, but specifically noted: "In the field of regulatory statutes governing business activities, where the acts are limited in a narrow category, greater leeway is allowed." That

**18.** *See* note 2 *supra.*

**19.** The Securities Exchange Act Release, which interprets a rule which, like Exchange Rule 8.7(a), prohibits transactions not "reasonably necessary to permit such specialist to maintain a fair and orderly market," states:

"I wish first to emphasize that compliance with the rule cannot be evidenced by a mere showing that a transaction by a specialist for his own account had no undesirable effect, or even no discernible effect, upon the market." No. 1117 (March 30, 1937).

**20.** The Commission concluded that the purpose of petitioner's transactions was to lower the price of the option series. The Commission reached this conclusion because petitioner and one other market maker were "short" with respect to that option series and because petitioner could give no alternative explanation. We have determined that the trades were in violation of Exchange Rules 4.1, 8.7(a), and 4.2 because they were not reasonably calculated to contribute to the maintenance of a fair and orderly market, and because they were inconsistent with the just and equitable principles of trade required of market makers; therefore, we

need not reach the issue of petitioner's specific purpose in making the trades.

Petitioner contends that there was not competent evidence of the movement of the underlying security. The evidence presented was of prices on the New York Stock Exchange, the security's primary market, rather than the prices shown on the composite tape observed by petitioner on the floor of the Exchange. The relevance of that evidence to a showing of motive is nil because we do not reach the issue of motive. While it would have been preferable for the Commission to retrieve the composite price information rather than infer the composite price from the primary market price, its failure to do so does not alter our view of petitioner's circular transactions. They were contrived and without legitimate economic purpose, and both the New York Stock Exchange prices, where the great majority of trades occurred, and what composite price information is before us, do not indicate otherwise.

**21.** Rules 8.7(a) and 4.1 are set out in note 2, *supra.*

is the case here. An understanding of the particularly sensitive position of the market maker in the Exchange persuades us that the rule is appropriately specific to withstand constitutional scrutiny.

The sole function of the market maker is to aid in maintaining a stable market. Since matching orders of public investors wishing to buy and sell the same quantity of the security at the same time and the same price often do not appear in the market place on any given day, market makers trade for their own accounts to provide a substitute for the matching of public orders against one another. In this manner, they can alleviate the price impact of the temporary disparities between supply and demand. However, were the activities of such professional dealers not severely restricted, market makers could ignore the needs of the market place and trade only to maximize their own profits.

In circumscribing the role of the market maker, the Commission has instructed national securities exchanges to impose "[r]equirements, as a condition of a specialist's registration, that a specialist engage in a course of dealings for his own account to assist in the maintenance, so far as practicable, of a fair and orderly market . .," Commission Rule 11–b–1(a)(2)(ii), 17 C.F.R. 240.11b–1(a)(2)(ii), and to enact "[p]rovisions restricting his dealings so far as practicable to those reasonably necessary to permit him to maintain a fair and orderly market . . . ." Commission Rule 11b–1(a)(2)(iii), 17 C.F.R. 240.11b–1(a)(2)(iii).

Exchange Rule 8.7(a) requires that trades be "reasonably calculated to contribute to the maintenance of a fair and orderly market." It is clear that the Commission intended to impose on the market maker an affirmative obligation applicable to all trades in all market conditions. Such a standard could not be fully spelled out in a series of specific prohibitions. The market maker is a professional who has voluntarily assumed this delicately-balanced and often very profitable position. By registering as a specialist, he has agreed to act only within certain parameters according to calculations which require his sophisticated judgment. Further, the rule specifies only that his trades be *reasonably* calculated to contribute to the maintenance of a fair and orderly market, allowing him some leeway for misjudgment. In these circumstances, we conclude that Rule 8.7(a) gave "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo*, 322 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

Petitioner's contentions that Rules 8.7(a) and 4.1 cannot be violated without the violation of another rule must also be rejected. The Exchange rules are "something of a catch-all which . . . preserves power to discipline members for a wide variety of misconduct, including merely unethical behavior." *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). In addition, because these are rules of the Exchange, the Exchange should be allowed discretion in determining their meaning. *Fogel v. Chestnut*, 533 F.2d 731 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Intercontinental Indus., Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971), *cert. denied*, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 81 (1972); *Moses v. Burgin*, 445 F.2d 369 (1st Cir. 1971). Here the Commission has affirmed that interpretation, and we find no error in its approval.

The order of the Commission is affirmed.